282 So.2d 532 (1973)
Theodore C. MELANCON
v.
I. M. C. DRILLING MUD et al.
No. 9368.
Court of Appeal of Louisiana, First Circuit.
July 10, 1973.
Rehearing Denied August 23, 1973.
Writs Refused October 19, 1973.
*534 C. Alan Lasseigne, John L. Lanier and John F. Pugh, Thibodaux, for appellant.
Donald L. King, New Orleans, for appellees.
Before SARTAIN, BLANCHE and WATSON, JJ.
BLANCHE, Judge.
Plaintiff, Theodore C. Melancon, Jr., filed suit seeking recovery under the Jones Act (46 U.S.C., Section 688) and the General Maritime Law for injuries which he sustained on May 14, 1967, while aboard the vessel IMCO DRILLER. The IMCO DRILLER was owned by the defendant, I.M.C. Drilling Mud, Division of International Minerals and Chemical Corporation, and insured by the defendant, Liberty Mutual Insurance Company. Recovery under the Jones Act was sought on the basis of the negligence of the defendant-employershipowner, and recovery under the General Maritime Law was sought on the basis of the unseaworthiness of the vessel. The accident occurred on navigable waters in Terrebonne Parish, Louisiana, at a time when plaintiff, as captain of the vessel, and others were attempting to unload heavy mud cans from the deck of the vessel to an oil rig.
The trial court rendered judgment in favor of the defendant dismissing plaintiff's claim and plaintiff has appealed. Essentially, the principal issue on appeal is whether the plaintiff sustained the burden of proving negligence and/or unseaworthiness. Related to this issue is the question of whether the trial judge committed error in permitting the defendant to cross-examine one of its own employees.
We have reviewed the evidence and are of the opinion that the following facts are established by a preponderance of the evidence.
The mission of the IMCO DRILLER was to transport drilling water, drilling mud and other supplies to the rig Jubilee located approximately five miles out in the Gulf of Mexico. The plaintiff as captain of the vessel received this request on the evening of May 13. During the late evening hours of that day personnel of the defendant at its dock in Dulac loaded the vessel with fifty cans of drilling mud. Each can was four feet square by six feet in height and weighed approximately five thousand pounds, and the cans were loaded in rows of approximately nine cans each on the deck. The proper way to secure the mud cans was to fasten chains and binders to each row of cans. Only three pieces of chain were used to secure the entire cargo *535 of mud cans. The captain had the responsibility for loading the vessel and properly securing its cargo. The captain could require the vessel to be reloaded if it was improperly loaded and he could refuse to move the vessel until it was properly loaded. If there were insufficient chains and binders aboard to secure the mud cans, the captain had the authority to order them at supply houses in the area that were open twenty-four hours per day. The captain did not supervise the loading of the vessel, as the loading operation was conducted during the late evening and early morning hours while the captain was asleep. After leaving the defendant's dock at Dulac, plaintiff then proceeded to the Union Oil Company dock where he loaded aboard some loose cargo. Thereafter, he proceeded on his way into the Gulf of Mexico and upon entering the Gulf the vessel encountered rough seas. Waves estimated by witnesses ranged from five to eight feet high. It was the captain's responsibility to determine if the seas were too rough for the safety of the crew and its cargo, and it was his decision whether to proceed on his mission or return to sheltered waters or lay anchor and wait until the seas were calm enough to accomplish his mission of delivering the vessel's cargo. While proceeding in the Gulf, the cargo of mud cans had shifted on three or four occasions and the captain had ordered his chief engineer, Alvin Collins, Jr., to shift the ballast in order to overcome the list occasioned by the shifting cargo. This testimony was elicited from Alvin Collins, Jr., the engineer, though denied by Captain Melancon. Upon arrival at the rig, the rig personnel were not ready to accept the vessel's cargo, and the IMCO DRILLER lay anchor and stood by for approximately two hours with its bow headed into the seas. Upon being informed that the rig would take the cargo, the captain was required to put the stern of the IMCO DRILLER against the west side of the rig because of the location of the cranes on the rig used to unload the vessel, thus placing his vessel broadside to the heavy seas. The unloading operation was participated in by the ship's crew and two of the rig's crew. After unloading the loose cargo and approximately two of the mud cans, plaintiff went out on the deck to help secure a mud can which had shifted and was in danger of falling into an opening on the starboard side of the vessel. While attempting to secure this mud can, other mud cans began to shift on the deck and plaintiff was crushed by them against the side of the vessel and was severely injured. Subsequently, the IMCO DRILLER capsized and sank.
The defendant sought to recover $213,147.80 in damages from the plaintiff on the ground that his negligence as master and captain caused the vessel to sink. This reconventional demand was dismissed during trial and is no longer an issue.
Our appellate review of a case brought under the Jones Act and the General Maritime Law is governed by Rule 52(a) of the Federal Rules of Civil Procedure. Although Louisiana courts have the constitutional authority (Section 29 of Article 7 of the Louisiana Constitution) to review both the law and the facts of a case, they may not under federal law and jurisprudence disturb the findings of the trial judge on the merits in such cases unless the findings of the trial judge are clearly erroneous.
The most widely-quoted definition of clear error is found in United States v. United States Gypsum Company, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948):
"A finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

WAS THE IMCO DRILLER UNSEAWORTHY?
With the foregoing scope of review in mind, we now turn to the evidence regarding *536 the unseaworthiness vel non of the vessel IMCO DRILLER.
The test of whether or not a vessel or its equipment is seaworthy lies in the answer to the question of whether the ship or its appurtenances are reasonably fit for her intended service. Robichaux v. Kerr McGee Oil Industries, Inc., 317 F.Supp. 587 (W.D.La.1970).
The plaintiff contends that the failure of the trial judge to find the vessel unseaworthy for the reason that there were not sufficient chains and binders on board to secure the cargo is contrary to the evidence and clearly erroneous. As related above, the IMCO DRILLER was used primarily to transport cargo to defendant's facilities, and chains and binders were necessary and proper appurtenances to secure such cargo. The failure to have such equipment on board to secure and protect the cargo and the ship's personnel would, in our opinion, render the vessel unseaworthy.
Our review of the evidence reveals the following concerning the presence of chains on board the IMCO DRILLER. Captain Melancon testified that there were no such chains aboard the vessel. (Tr. of Sept. 14-15, 1970, Vol. I, pp. 145, 146, 147) Alvin Collins, Jr., the engineer aboard the DRILLER, testified that he did not see any chains on the boat and again that he did not remember any at all. (Tr. of Sept. 14-15, 1970, Vol. I, p. 168) He further testified that even though his duties as an engineer did not require a concern for whether chains were on board, he looked for chains with the rest of the crew and did not see any personally. Thus, the evidence establishes that a search was made for the chains and none were found.
Two other members of the alternate crew on the DRILLER testified regarding the chains, Joseph C. Galjour, a deckhand, and Paul Chauvin, an engineer, both of whom had only served in the crew for a period of one week prior to the accident. Mr. Galjour, in response to questions concerning the chains, testified about the chains which secured the bulk mud tanks and were welded to the deck of the vessel. He knew of no other chains aboard. (Tr. of June 1, 1971, Vol. I, p. 85) Mr. Paul Chauvin's testimony to the same effect was stipulated.
The testimony most favorable to the defendant concerning the presence of chains on the vessel came from Alvin Collins, Jr., captain of the sister ship of the DRILLER, the IMCO EXPLORER. His testimony was that ten or twelve chains and binders were aboard his vessel and were removed to the DRILLER for the purpose of securing mud cans which the DRILLER was about to transport on a run from Berwick to Cameron. He also testified that the chains and binders were never returned to his vessel. (Tr. of June 1, 1971, Vol. I, p. 28) The removal of these chains and binders, as noted above, was occasioned by the initial trip of the IMCO DRILLER when it was to transport fifty cans of drilling mud from Berwick to Cameron, and as the DRILLER had been newly commissioned no chains and binders were aboard to secure her cargo.
As explained by John Fuzzette, the marine manager for defendant, for the sake of expediency he had ordered the transfer of the chains.
Captain C. J. Collins, the alternate captain of the DRILLER, testified concerning the trip from Berwick to Cameron and verified that chains were brought aboard the DRILLER from the EXPLORER. He also testified the chains were not removed and to the best of his knowledge they were aboard when the crew changed on Tuesday, the week before the accident.
Considering that the chains were transferred from the EXPLORER to the DRILLER in February of 1967, approximately two or three months prior to the accident, and the absence of any testimony to contradict the positive testimony of plaintiff's witnesses that no chains were *537 aboard at the time of the accident, we are of the opinion that the preponderance of the evidence shows that the chains were not aboard the DRILLER at the time of the ill-fated trip on May 14, 1967.
It follows, therefore, that the failure of the trial judge to find the cargo-carrying vessel unseaworthy because of the lack of proper and necessary appurtenances to safely secure its cargo is clearly erroneous. It should be remembered that actually no credibility of witnesses is involved in this determination, as the question is primarily resolved by determining what evidence preponderates.
In the case of Blue Streak Enterprises v. Cherrie, 263 So.2d 734 (La.App. 4th Cir. 1972), the Court stated:
"* * * On probative value of testimony, the findings of the trial judge will not be taken as conclusive. [Citations omitted] The rule that the judgment of the trial court on questions of fact will not be disturbed unless manifestly erroneous is not applicable here, since the question is one of sufficiency and preponderance of evidence rather than credibility of witnesses. * * *" (Blue Streak Enterprises v. Cherrie, 263 So.2d 734, 737)
While we have found the vessel unseaworthy for the reasons stated hereinabove, we reject plaintiff's claim that the vessel was unseaworthy because it was undermanned. An inadequately or improperly manned vessel presents a classic case of unseaworthiness. See June T., Inc. v. King, 290 F.2d 404 (5th Cir. 1961). Plaintiff has contended a crew of four was required to man the ship, and inasmuch as only three members comprised the crew, the crew was insufficient to accomplish the mission to unload the vessel. Normally, a crew of four was required for the vessel, but the IMCO DRILLER finally ended up with a three-man crew, as the captain and all of the members of the crew petitioned the defendant to do without a cook on board providing that the salary of the cook be divided among the remainder of the crew. This request was granted at the crew's insistence. There was no showing that a cook was required to participate in unloading the vessel. Captain Collins testified, in effect, that he had never seen a cook do anything aboard ship except cook. Additionally, two members of the rig crew participated in the unloading operation. We find no merit in the contention that the vessel was unseaworthy by virtue of an inadequate crew.

WHAT CAUSED PLAINTIFF'S INJURIES?
The plaintiff was injured as a result of the unseaworthiness of the vessel in that the proper appurtenances in the form of chains and binders were not available on board the ship in order to safely secure its cargo and as a result of attempting to unload the vessel with its cargo thus unsecured after positioning the vessel broadside to heavy seas.
We again refer to the test stated in Robichaux v. Kerr-McGee Oil Industries, Inc., cited supra, i. e., whether or not a vessel or its equipment is seaworthy lies in the answer to the question of whether the ship or its appurtenances are reasonably fit for her intended service.
The intended service of the IMCO DRILLER was to transport cargo to its various facilities, one of which was the rig Jubilee located in the Gulf of Mexico. Equipment such as chains and binders were absolutely necessary appurtenances to make the ship reasonably fit for her intended service. Accordingly, the absence of chains and binders made the IMCO DRILLER not properly fit for her intended service.
Even if we are in error concerning the unseaworthiness of the vessel because of the absence of the necessary appurtenances, the condition of unseaworthiness was also occasioned by the method and *538 manner by which the vessel was loaded and its cargo secured. Fifty cans of mud weighing 5,000 pounds each secured with only three chains, which chains were loosened during the unloading operation while the vessel was broadside to rough seas, made the ship unseaworthy.
Unseaworthiness may arise from any number of individualized circumstances. The Court in Morales v. City of Galveston, Texas, 291 F.2d 97 (5th Cir. 1971), affirmed 370 U.S. 165, 82 S.Ct. 1226, 8 L. Ed.2d 412, rehearing denied, 371 U.S. 853, 83 S.Ct. 16, 9 L.Ed.2d 93, made the following enumeration:
"Her gear might be defective her appurtenances in disrepair, her crew unfit. The method of loading her cargo, or the manner of its stowage, might be improper. [Citations omitted] * * *" (Morales v. City of Galveston, Texas, 370 U.S. 165, 170, 82 S.Ct. 1226, 1230)

WAS I. M. C. NEGLIGENT?
The IMCO DRILLER was under the command of two captains, the plaintiff, Theodore C. Melancon, and C. J. Collins, and they were under the supervision of John Fuzzette, the marine supervisor. Mr. Fuzzette went on board the vessel once or twice a week for the purpose of checking the vessel to determine if its condition was satisfactory, but he admittedly did not ascertain whether chains and binders were on board, even though they were absolutely necessary appurtenances by all the evidence for a cargo-carrying ship. The last knowledge Mr. Fuzzette had of the chains was when he ordered them transferred to the IMCO DRILLER some two or three months prior to the ill-fated accident. Mr. Fuzzette testified that he did not usually walk aboard looking for chains and binders but depended on his captains to ask him for what they wanted. Undoubtedly, this was the method relied upon by Mr. Fuzzette to determine the needs of the vessel, but it does not absolve him of his duty as a representative of I. M. C. to ascertain that the vessel was "shipshape" or seaworthy. We, therefore conclude that the absence of chains on board at the time of the disastrous trip, which made the vessel unseaworthy as well as an unsafe place to work, was attributable to the negligence of both I. M. C. and Captain Melancon.
Under the Jones Act, if I. M. C.'s negligence played any part, however slight, in producing plaintiff's injury, even though the plaintiff also may have been negligent and contributed to such injury, the plaintiff, nevertheless, would be entitled to recover because the statute (Federal Employers' Liability Act, 45 U.S.C.A., Section 51 et seq.) expressly imposes liability upon the employer to pay damages for injury or death due in whole or in part to its negligence. Rogers v. Missouri Pacific Railroad Company, 352 U.S. 500, 506-507, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957). Further, the effect of plaintiff's contributory negligence while not barring his recovery, does diminish his damages in the proportion of the amount of negligence attributable to him. Federal Employers' Liability Act, 45 U.S.C.A., Section 53.

HOW MUCH WAS PLAINTIFF NEGLIGENT?
Plaintiff had the responsibiltiy for loading the vessel and could cause it to be unloaded were it loaded improperly and could have refused to move the vessel until it was loaded properly, but he was asleep when the vessel was loaded and never looked for chains and binders to secure the heavy cargo, although he knew or should have known that they were necessary appurtenances for the safety of the ship and its cargo. It was also shown that he had the authority to order chains and binders, if none were aboard, at several supply houses in the area that operated on a twenty-four hour a day basis.
We further find that plaintiff knew or should have known of the hazard of proceeding in heavy seas, as there was evidence from the engineer that plaintiff had *539 ordered him to take on ballast in order to trim the vessel as a result of a shift in the cargo at least three or four times while underway in the Gulf. Additionally, estimates of the height of the waves ranged from four to eight feet. Considering the foregoing, plaintiff's attempt to unload the vessel after placing it broadside to heavy seas with the cargo thus unsecured was, in our opinion, the negligence which was the cause in fact of the accident. There are other related charges of negligence leveled at the captain's lack of judgment in attempting to unload the cargo after removing the chains and thus leaving unsecured the entire cargo instead of unsecuring only one mud can at a time.
In view of the foregoing resume of negligent conduct of both plaintiff and defendant, we are of the opinion that plaintiff was more negligent than defendant and that his recovery of damages should be reduced 70 percent.

WHAT DAMAGES DID PLAINTIFF SUFFER?
After plaintiff was crushed against the bulwark of the vessel by a 5,000 pound mud can, the crew sought to extricate him and in the process of lifting one of the cans with the use of a derrick, Captain Melancon was "popped" out into the sea. Miraculously, he did not drown and has made a remarkable recovery despite serious injuries.
As would be contemplated, plaintiff received a mashing or crushing type of injury which was extremely painful. When he was brought to the hospital, he was in a severe state of shock, his blood pressure being practically unobtainable. X-rays revealed multiple fractures of the pelvis in the public bones, the rami and ischium. There were also serious injuries to the bladder and urinary tract, including a complete laceration of the dome or top of the bladder and a complete severance or tear of the urethra, both of which were repaired. A laceration of the mesentery of the small bowel was also sutured.
After the initial surgery had been completed, plaintiff's body virtually presented a picture of tubes and drains extending from the nose to the lower abdomen. Thereafter, a second surgical operation was performed to drain a large hematoma which extended from the left thigh all the way to the chest wall. Approximately one and a half quarts of blood were drained from the hematoma. In all, plaintiff received eleven pints of blood during his stay in the hospital. After about two months in the Terrebonne General Hospital, plaintiff was transferred to the Iberia Parish General Hospital in order to make the travel to and from the hospital easier for his family. At that time there still remained an open fistula which drained urine from the plaintiff's bladder through the abdominal wall. On August 7, approximately three months after the accident, he was discharged from the hospital.
Following plaintiff's hospital discharge, he underwent extensive physical therapy. Because of scar tissue in the urethra, it was also necessary to dilate the urethra periodically to prevent blocking of the flow of urine. Dr. Edmond A. Lamperez, a urologist, described this as a painful procedure necessitating the administration of narcotics. Plaintiff further complained of weakness of the left leg and decreased sensation in the left front and lateral sides of the left leg, all of which Dr. Guy Dunning, an orthopedic specialist, believed could have been caused by pressure against the sciatic nerve. For his leg involvement plaintiff was again admitted to the hospital where a myelogram was performed. This proved to be negative. Captain Melancon was considered by Dr. Dunning to be 20 percent disabled in the left lower extremity and 10 percent of the whole body and could not, according to his opinion, carry out any activity of labor where strength and agility of the left lower extremity was involved. Captain Melancon also complained of impotency and this was corroborated *540 by Dr. Lamperez, the urologist, as being consistent with the nature of plaintiff's injuries.
Our review of the foregoing evidence convinces us that plaintiff suffered severe pain and will suffer pain in the future. For the aforesaid damages we make a compensatory award of $100,000.
With regard to future medical expenses, plaintiff will be required to undergo urethral dilations at a cost of approximately $32 each at intervals estimated at every three or four months and in time possibly every six months. We are not able to predict with accuracy the frequency of these treatments and the constancy of the cost thereof over the years that the treatments may be required but feel certain they will amount to an item of damage. A further matter to be taken into consideration is the fact that free medical service is furnished to Captain Melancon at the Public Health Service Hospital in New Orleans. However, this would not be without expense to him because he would have to travel from New Iberia to New Orleans and return, each trip thus occasioning 150 miles of travel.
Where it is clear that a plaintiff has sustained some damage as a result of the defendant's negligence, his demand for damages will not be rejected merely because he has not established the exact amount of compensable damages suffered. In such case the courts have discretion to fix the amount thereof. Cotton v. Needham, 253 So.2d 674, 675 (La.App. 1st Cir. 1971), writ refused, 260 La. 129, 255 So.2d 353.
Accordingly, we fix an award of $1,500 to compensate plaintiff for future medical expenses.
With regard to loss of earnings, the plaintiff claims entitlement to loss of wages during the years 1968, 1969 and 1970. His 1968 income tax return shows and plaintiff testified that he was paid $5,067.31 by I. M. C. Plaintiff's salary while employed as a boat captain for I. M. C. was $600 per month or $7,200 per year. We are of the opinion that Captain Melancon has substantiated a claim for $2,132.69 for loss of wages for the year 1968. Concerning his loss of wages for 1969, 1970 and for future years, Captain Melancon has failed to carry the burden of proof as to his entitlement thereto. No income tax returns were filed in evidence by him for the years 1969 and 1970, and the plaintiff's testimony was unrevealing as to his earnings for those years.
Moreover, the medical evidence does not convince us that plaintiff is totally and permanently unable to work. Even though Dr. Dunning testified that plaintiff could not perform work involving heavy labor, the evidence convinces us that Captain Melancon could engage in gainful employment and could even serve as a boat captain or engineer. In fact, plaintiff was offered a job by defendant as an engineer which he declined. Captain C. J. Collins testified that the engineer's job is not physically demanding and is not a difficult job to perform from a physical standpoint. Additionally, the evidence of Captain Melancon's physical ability belies his claim of total and permanent disability. There is testimony that he was seen in a boat with some 30 to 35 nutria, but Captain Melancon contended they were trapped by others in his employ. The plaintiff also testified in regard to his crabbing and shrimping activities, claiming they were performed by other people working for him. In this connection, Dr. Dunning testified that Captain Melancon had furuncles of the hand which were similar to small boils and were caused by breaking the skin as may occur while a person is engaged in crabbing or shrimping activities. We have observed four reels of movies taken of Captain Melancon which depicted his activities, and these films clearly showed that plaintiff is not nearly as disabled as he would have the Court believe. He was able to walk without a limp and without the use of a *541 cane. The films showed him engaged in strenuous physical activities such as carrying boxes, running, stepping over trailer hitches, carrying a marine battery with another man, winching a boat in place on a trailer and shoveling ice.
Considering the foregoing, plaintiff's claim for loss of future income is rejected.
Lastly, we concern ourselves with whether the judgment which we will award in favor of plaintiff should bear interest from date of judicial demand or from date of judgment. In Jones Act cases there is no pre-judgment interest. See Cleveland Tankers v. Tierney, 169 F.2d 622 (6th Cir. 1948) and the cases there cited. The award of interest in maritime cases from date of judicial demand as opposed to the date that damages are actually fixed by judgment is within the sound discretion of the trial judge. Ferdinandtsen v. Delta Marine Drilling Company, 235 So.2d 641 (La.App. 4th Cir. 1970). In the absence of any statutory prohibition, we will follow our usual custom of granting interest from date of judicial demand until paid.
The trial court did not tax as costs the depositions filed in the record, nor did it fix the fee of the expert witnesses. The total cost of these depositions is $124.50, which is to be taxed as costs. The expert witness fees of the doctors who testified either at trial or by deposition are fixed as follows: Dr. Guy Dunning, $300; Dr. Phillip Cenac, $300; Dr. Roy Dugas, $300; Dr. E. Weeks Dauterive, $50; and Dr. Edmond A. Lamperez, $100.
For the above reasons, an award of $103,632.69 would be made in plaintiff's favor. However, by virtue of his own negligence in contributing to those damages, we reduce the award by 70 percent, thus leaving an award to plaintiff in the sum of $31,089.81.
Therefore, the judgment of the trial court is reversed and judgment is rendered herein in favor of plaintiff, Theodore C. Melancon, Jr. in the sum of $31,089.81 and against the defendants, I. M. C. Drilling Mud, Division of International Minerals and Chemical Corporation, and Liberty Mutual Insurance Company, in solido, with legal interest thereon from date of judicial demand until paid, together with all costs of court.
Reversed and rendered.