CULPEPPER, Judge.
This is a personal injury suit arising out of an accident which occurred on June 12, 1975. While working as a driller for International Salt Company at the Avery Island Salt Mine, plaintiff, Herbert Placide, Jr., was injured when violently strück in the groin area by a wrench used in the drilling operation. Made defendants are: (1) Lester Jay, plant manager, (2) Gerald Lavio-lette, shift production foreman, (3) Bruce Young, mine supervisor, (4) Harold Mosele, personnel manager, (5) Donald Mooney, maintenance supervisor, (6) Aetna Casualty & Surety Company, liability insurer for International Salt, and its executive officers; and (7) J. H. Fletcher & Company, manufacturer of the drilling rig being operated by plaintiff at the time of the accident. Plaintiff contends that the defendant executive officers of International Salt were negligent in failing to provide him safe equipment and a safe place to work. The liability of the J. H. Fletcher Company is based on the allegation that the drilling rig was defective, in that it lacked additional safety devices. Aetna Casualty & Surety *475 intervened as workmen’s compensation insurer for International Salt to recover benefits paid to plaintiff. By unanimous verdict, a jury found defendants Lester Jay and Bruce Young negligent and the plaintiff not guilty of contributory negligence. The jury awarded damages in the amount of $540,000.00. J. H. Fletcher Company was not found negligent. Defendants, Jay, Young and Aetna have appealed. Plaintiff answered the appeal, contending that La-violette and Mooney were also negligent.
The issues are: (1) Were the defendant executive officers negligent? (2) Was plaintiff contributorily negligent? (3) Must the award be reduced?

GENERAL FACTS.

At the time of the accident, plaintiff had been employed by International Salt for nine years. He started as a loading attendant, but, within a year, began working in the caverns down below the surface of the earth. When first down in the mines, plaintiff was a driller’s helper. As such, he was taught to operate the drilling machines by older, experienced workers. Eventually, plaintiff became a full-time driller and regularly operated a certain drilling machine manufactured by the J. H. Fletcher Company, known as a “Fletcher rig.”
The machine is like a miniature oil drilling rig. It is used to drill vertical holes in the floor of the salt mine, into which holes explosives are. inserted. There is an overhead rotary block into which drill pipes, each about ten feet long, are screwed. The rotary block turns in a clockwise direction and moves downward as the drilling bit penetrates the salt. While turning, the drill pipe is in a recessed groove in a vertical boom.
As manufactured, the rig was equipped with a metal clamp, concave in shape, bolted to the vertical boom. The clamp was hinged, so it could be latched over the drill pipe to hold it in the groove. The purpose of the clamp was to keep the drill pipe from bending and coming out of the groove due to vibration while the drill was turning. The clamp had been missing from plaintiff’s rig for several weeks before the accident.
The operator stands on a platform, about four feet above the floor and attached to the vertical boom. He causes the rotary block to turn in a clockwise motion and to simultaneously move downward to drill the pipe into the salt. Depending on the depth of the hole desired, it was necessary to use a number of pipe segments. After one pipe had been drilled down, the segment was disengaged and a second pipe segment was inserted. This sequence was repeated until the desired depth was reached.
When the hole was completed, the drill pipe was removed by reversing the drilling process. The accident in the present case occurred while plaintiff was removing segments of pipe from the hole. The procedure was to raise the drill head and pull the pipe out of the hole one segment at a time. As each segment came out of the hole, it was unscrewed, first from the pipe segment still in the floor and then from the drill head. The connection between the segment being removed and the pipe still in the floor was loosened by using a mechanically operated vise, to hold the segment in the hole, while the operator loosened with a pipe wrench the segment to be removed. Then, to unscrew the connection between the pipe being removed and the drill, the drill was activated in a counter-clockwise motion, and the spinning pipe was manually gripped with a pipe wrench. The operator held the wrench against the vertical boom on the back side of the pipe until the wrench caught the pipe and unscrewed it. When the pipe was completely unscrewed, both from the segment in the floor and from the drill head, it was manually removed by the operator and stored on a pipe rack.
The accident occurred as plaintiff was removing the first pipe segment. He had used the mechanical vise and loosened with a pipe wrench the connection between the segment still in the floor and the segment to be removed. Then, as he customarily did, he turned on the drill counter-clockwise and held the pipe wrench behind the spinning drill pipe and braced against the vertical boom. As the pipe wrench caught and held the spinning pipe, the pipe, not being *476 latched, came out of its groove. This caused plaintiff to lose his hold on the pipe wrench. The handle of the wrench suddenly moved in a counter-clockwise direction toward plaintiff, who was standing on the platform. The handle of the wrench struck plaintiff near the base of his penis. There was no protective barrier between the operator and the drilling rig to prevent such an accident.

NEGLIGENCE OF THE EXECUTIVE OFFICERS

The evidence is clear that the protective clamp had not been on the drilling rig for several weeks, and that the executive officers knew this. A member of the safety committee had reported it to the supervisory personnel, but no corrective action was taken. Missing or defective clamps were frequent problems.
Defendants contend there was no credible evidence which showed negligence on the part of International Salt’s supervisory personnel. Defendants attack the credibility of plaintiff’s testimony as to how the accident happened. They also attack the opinion of plaintiff’s expert that the pipe bowed out of its groove under the force of the wrench. Thus, defendants argue plaintiff has failed to establish the absence of the clamp as the cause of the accident.
Plaintiff was the only witness to the accident. He testified the pipe “broke away”, but that it happened so fast he was unable to offer any explanation as to how or why the accident occurred. Plaintiff’s expert was of the opinion that, since the pipe was not clamped, it bowed, from pressure of the wrench, and came out of its groove, and this caused plaintiff to lose his hold on the wrench.
Plaintiff’s description of what happened was consistent with the experience of others who have operated the drilling rig. Two witnesses testified they had similar accidents while performing the same operations. It should be noted that defendants offered no expert and no alternative explanation as to how the accident might have occurred.
There was much testimony concerning the relationship between the absence of the clamp and the resulting accident. Defendant Mooney, maintenance foreman, and de-, fendant Young, mine superintendent, both testified that it would be impossible for the pipe to move out of the groove if the clamp was in place. Defendant Gerald Laviolette, production foreman, testified that a properly functioning clamp would hold the pipe in its groove, even if the pipe bowed. From this, the jury could have reasonably inferred that the accident would not have occurred had there been a proper clamp on plaintiff’s rig.
International Salt had established procedures through which maintenance problems could be brought to the attention of supervisory personnel. While none of the defendant executive officers recalled being specifically informed about the broken guard on plaintiff’s rig, all defendants were aware of a general problem with the clamps. The subject of the clamps was regularly discussed at weekly safety meetings. Yet, there was no stockpile of spare parts and no persistent effort to keep the clamps repaired. The procedure for repair would háve taken 30 minutes at the most.
In the light of all testimony, the jury could reasonably have concluded that the appellants were negligent in failing to maintain the clamp on plaintiff’s rig. Certainly, the jury was not clearly wrong, under the rules of appellate review stated in Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The only defendants found negligent were Lester Jay, plant manager, and Bruce Young, mine superintendent. There is evidence that these two had direct and ultimate authority for all operating conditions. We conclude the jury was not clearly wrong in failing to find Laviolette and Mooney were also negligent.

CONTRIBUTORY NEGLIGENCE

Defendants argue that plaintiff was contributorily negligent in applying the wrench to the pipe while it was turning. Jay, Laviolette and Young testified the wrench should not be applied while the pipe *477 is spinning. However, the evidence shows the drillers customarily applied the wrench to the spinning pipe, and it can be reasonably inferred the supervisory personnel knew this. Plaintiff had received only on-the-job training by other drillers. There was no evidence that he had been instructed to apply the wrench before he turned on the drill. Under these facts, the jury was not clearly wrong in finding that plaintiff’s actions were those of a reasonable man under the circumstances. Willis v. Stauffer Chemical Company, 348 So.2d 158 (La.App. 3rd Cir. 1977), rehearing at 349 So.2d 1390 (La.App. 3rd Cir. 1977).

QUANTUM

The most serious issue in this case is whether the amount of the award must be reduced. In Carollo v. Wilson, 353 So.2d 249 (La.1977) the court stated:
“[3,4] The courts of appeal have a constitutional duty to review the law and facts and thereafter render a judgment on quantum based on the merits, determining whether the jury has abused its “much discretion” that the law accords it in awarding damages. La.Const. art. 5, § 10(B); La.Civil Code art. 1934(3); Temple v. Liberty Mut. Ins. Co., 330 So.2d 891 (La.1976). Before an appellate court can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977); Anderson v. Welding Testing Laboratory, 304 So.2d 351 (La.1974); Bitoun v. Landry, 302 So.2d 278 (La.1974).”
In the recent case of Reck v. Stevens, 373 So.2d 498 (La.1979), our Supreme Court states:
In the event the appellate court finds from the record an abuse of discretion, the award may be disturbed by lowering it to the highest point which is reasonably within the discretion afforded the trier of fact. Schexnayder v. Carpenter, 346 So.2d 196 (La.1977); Coco v. Winston Industries, Inc., supra.
The award in the present case is not itemized. In answer to an interrogatory, “What amount would compensate Herbert Placide, Jr. for his damages?”, the jury simply answered “$540,000.” Thus, the award includes both general and special damages.
After the accident on June 12, 1975, plaintiff was first seen by Dr. Roy Landry who found plaintiff, then 27 years of age, suffering moderately severe pain and swelling from an injury at the base of the penis. No injury to the back was diagnosed by Dr. Landry. He referred plaintiff to urologists for a possible injury to the urethra, but tests indicated healing had begun and plaintiff was discharged from the hospital on June 15, 1975.
Plaintiff saw his family physician, Dr. G. D. Sagrera, on June 19, 1975, complaining of tenderness in his penis. Dr. Sagrera referred plaintiff to Dr. Blacham, a urologist.
On June 30, 1975, plaintiff was examined by Dr. Spencer Walton, an orthopedic surgeon, who diagnosed a muscle strain in the low back. Plaintiff continued to see Dr. Walton for his back strain until April of 1976. There are no residuals of the back injury.
Plaintiff was seen by Dr. Sagrera again on July 11, 1975 and July 22, 1975 for complaints or impotence, i. e., the inability to have an erection sufficient for penetration.
On August 8,1975, plaintiff began a long course of treatment by Dr. Brantly Scott, a urological surgeon in Houston, Texas. Dr. Scott specializes in impotency. He diagnosed that plaintiff was impotent. More specifically, Dr. Scott explained that the blow to the base of the penis left scar tissue which impaired the blood supply into the penis to the extent that plaintiff could not have a full erection. He recommended the only treatment available, á surgically implanted silicone-rubber prosthesis.
On October 10, 1975, Dr. Scott surgically implanted this prosthesis. It consists of two cylindrically-shaped silicone-rubber cylinders, which are expansive. The cylinders are placed inside the erectile bodies of the *478 penis. They are connected by tubes to a pump implanted in the scrotum. The pump is connected by tubing to a silicone-rubber fluid reservoir, which is placed in the abdomen near the bladder. When the patient wants to have an erection, he squeezes with his fingers the pump inside the scrotum a sufficient number of times to pump fluid from the reservoir into the cylinders in the penis. This procedure takes about five minutes. After completing intercourse, the patient then squeezes a valve, also in the scrotum, which allows the fluid to flow from the cylinders in the penis back into the reservoir in the abdomen.
After the implant of the prosthesis and recovery from the initial surgery, plaintiff returned home and was able to have an erection. His wife testified they had intercourse two or three times a week, which was about the same as before the accident.
In February of 1976, plaintiff erected his penis but was unable to deflate the cylinders because of a malfunction. He returned to Houston, where Dr. Scott replaced the prosthesis on February 24, 1976.
In April of 1977, the prosthesis developed a leak. Plaintiff returned to Houston and Dr. Scott replaced it again. In August of 1977, there was a fourth surgical procedure to shorten a portion of the tubing, but the device was not replaced. '
Defendants make much of the fact that in January of 1977 Dr. Sagrera, plaintiff’s family physician, diagnosed gonorrhea. Plaintiff and his wife had separated in November of 1976, and it was Dr. Sagrera’s understanding that plaintiff had been having sexual contact with another woman in Abbeville. Defendants argue that although plaintiff denied being able to have intercourse with the prosthesis, this evidence of the venereal disease and. the testimony of Dr. Scott show that plaintiff was actually having intercourse after the implant. Defendants argue also that plaintiff tried to deceive the jury by testifying at one point that he did not have intercourse after the initial surgery. Of course, plaintiff’s wife and Dr. Sagrera testified to the contrary. A careful reading of plaintiff’s testimony shows he intended to say that although he had intercourse after the implant, it was not very satisfactory. We cannot agree with the defendants that plaintiff was trying to deceive the jury.
There are very few cases involving awards for similar injuries. The closest case cited is Galloway v. Employers Mutual, 286 So.2d 676 (La.App. 4th Cir. 1973), where a jury awarded $200,000 to a plaintiff whose entire penis was traumatically amputated in an accident. In Melancon v. IMC Drilling, 282 So.2d 532 (La.App. 1st Cir. 1973), $100,000 in compensatory damages was awarded in a Jones Act case for a crushing injury which fractured the pelvic bones, severed the urethra, injured the bladder and the small bowel and left plaintiff impotent.
We have found two cases from other states involving similar injuries. In Whitney v. Walker, 25 Utah 2d 202, 479 P.2d 469 (1971), the court affirmed a jury award of $37,500 in general damages to a 40-year old real estate salesman for a laceration of the calf, injuries to the pelvic region and painful injuries to the groin area, for which he was hospitalized for 16 days and was unable to work for a period of six months, and where the injuries included a 6-inch tear in the scrotum and an injury to the penis which rendered him permanently, partially impotent. In Norton Company v. Harrelson, 176 So.2d 18 (Ala.1965), the court affirmed a jury award of $40,000 for a laceration of the penis resulting in permanent scar tissue which could not be removed by further surgery and which caused plaintiff pain and discomfort.
Under the rules of appellate review of quantum stated above, we conclude the record clearly shows the jury in the present case abused its “much discretion” in awarding a total of $540,000. We find that the highest award which was reasonably within the discretion of the jury was the sum of $250,000 in general damages, plus special damages.
The special damages consist of $47,733 in past loss of wages. Plaintiff has no permanent disability to work and thus no loss of *479 future wages. Also, the stipulated medical expenses are $17,365. Thus, the total special damages are $65,098.
For the reasons assigned, the judgment appealed is amended to reduce the award to plaintiff from the sum of $540,000 to the sum of $315,098. Otherwise, the judgment is affirmed. All costs of this appeal are assessed against the defendant-appellant.
AFFIRMED, AS AMENDED.