426 So.2d 623 (1982)
Nolan PORTIER
v.
TEXACO, INC.
No. 82-CA-0144.
Court of Appeal of Louisiana, First Circuit.
November 16, 1982.
Rehearing Denied February 25, 1983.
*624 Grady C. Weeks, Houma, for plaintiff and appellee.
*625 Miles P. Clements, New Orleans, for defendant and appellant.
Before EDWARDS, WATKINS and SHORTESS, JJ.
EDWARDS, Judge.
Plaintiff, Nolan Portier, brought this action under the Jones Act, 46 U.S.C. sec. 688, and general maritime law. Portier's suit alleged that he had suffered serious disabling injuries while working for defendant, Texaco, Inc., as a rotary helper aboard the Drilling Barge TERREBONNE BAY, owned and operated by the defendant.
A reading of the record reveals the following facts surrounding plaintiff's accident and subsequent disability. Plaintiff suffered his injury while working with a crew which was lifting a forty-foot long section of five-inch drill pipe into the elevator located above the drilling rig's rotary table. Another Texaco employee, James Fontenot, was operating the air hoist which was being used to lift the drill pipe. Plaintiff and another helper, Cliff Ludeman, stood on either side of the pipe in order to guide it into the elevator. Another coworker, Malcolm Westley, stood behind the elevator, ready to latch the elevator around the front end of the pipe. The first attempt to latch the pipe was unsuccessful, as the front end of the pipe would not fit properly into the elevator. Fontenot then attempted to jerk the pipe in order to get it into the elevator latch properly. Fontenot intended to allow the pipe to descend slowly, then shift the hoist into an upward position, causing the pipe to jerk into the elevator. As Fontenot undertook this procedure, Portier, who had his back to Fontenot, kept his hands on the pipe in an attempt to guide it into the elevator. Portier and Fontenot testified that the pipe fell a distance of about one and one-half feet. This sudden drop caused plaintiff to wrench his back.
The trial court rendered judgment in favor of plaintiff in the amount of $932,960.80, representing $150,000.00 for past and future pain and suffering, $28,250.00 for loss of wages from the date of accident until the date of trial, $686,907.00 for loss of future wages and $67,830.80 for loss of future fringe benefits. The trial court's judgment for plaintiff was based on a finding of Jones Act negligence as well as unseaworthiness under general maritime law.
Defendant appeals the judgment of the district court, raising a variety of specifications of error. Texaco contends that the trial court erred in holding it liable for plaintiff's original accident and in concluding that plaintiff was free from any contributory negligence. Furthermore, defendant maintains that plaintiff's condition was worsened by chiropractic treatment which plaintiff sought and that the trial court erred in holding it liable for the consequences of that treatment. Additionally, Texaco contends that the trial court erred in considering a "productivity factor" in calculating plaintiff's loss of future wages and in basing plaintiff's award upon his gross income rather than his after-tax income. Finally, defendant contends that the trial court erred in allowing plaintiff prejudgment interest on the sum awarded. Each specification of error will be considered separately.
At the outset, however, we deem it appropriate to discuss the law applicable to plaintiff's action and the standard of review to be applied. Plaintiff's action was filed in the Louisiana courts pursuant to 28 U.S.C. sec. 1333, the "saving to suitors" clause. Federal substantive admiralty or maritime law applies to that action. Lavergne v. Western Co. of North America, Inc., 371 So.2d 807 (La.1979). Appellate review of a case brought under the Jones Act and general maritime law is governed by Rule 52(a) of the Federal Rules of Civil Procedure.[1]Kratzer v. Capital Marine Supply, *626 Inc., 645 F.2d 477 (5th Cir.1981). Under federal law and jurisprudence the findings of the trial judge on the merits may not be disturbed unless they are clearly erroneous. Kratzer v. Capital Marine Supply, Inc., supra; Melancon v. I.M.C. Drilling Mud, 282 So.2d 532 (La.App. 1st Cir.), cert. denied, 283 So.2d 769, 771 (La.1973).
In McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954), the United States Supreme Court gave the following explanation of the clear error rule:
"A finding is clearly erroneous when `although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " 348 U.S. at 20, 75 S.Ct. at 7.

DEFENDANT'S LIABILITY FOR PLAINTIFF'S ACCIDENT
The trial court predicated defendant's liability to plaintiff upon two theories of recovery, Jones Act negligence and the general maritime law principle of unseaworthiness. Because these two bases of liability involve distinct concepts, they will be discussed separately.
The trial court found that the accident occurred either because the brake on the air hoist failed or because Fontenot, the air hoist operator, inadvertently placed the hoist control in the down position. It further concluded that Fontenot was negligent for failing to warn Portier that he was about to lower the pipe. Portier testified at trial that he was given no warning that the pipe was about to be lowered. Additionally, Fontenot admitted that he gave plaintiff no warning prior to lowering the pipe and that he heard no one else warn him. Both sides called petroleum engineers as expert witnesses. Each testified that the air hoist operator should not lower a load when there is someone underneath it and that he should at least warn anyone underneath before lowering the load. Defendant makes much of plaintiff's admission at trial that in an earlier deposition he testified that Cliff Ludeman warned him that Fontenot was going to attempt to bounce the pipe into the elevator. However, plaintiff remained adamant in his testimony at trial that he never received any warning. Furthermore, Cliff Ludeman was not called to testify at trial.
A trial court's findings regarding negligence are treated as findings of fact reviewable under the "clearly erroneous" standard. Tucker v. Calmar Steamship Corporation, 457 F.2d 440 (4th Cir. 1972). On the basis of the evidence in the record, we are unable to say that the trial court was clearly erroneous in concluding that Fontenot negligently failed to warn plaintiff that he was lowering the pipe. The Jones Act incorporates the standards of the Federal Employers' Liability Act (FELA), which renders an employer liable for the injuries negligently inflicted on its employees by its "officers, agents, or employees." 45 U.S.C. sec. 51; Hopson v. Texaco, Inc., 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740 (1966), per curiam. Under the Jones Act, evidence of slightest negligence is sufficient to sustain a finding of liability. Davis v. Hill Engineering, Inc., 549 F.2d 314 (5th Cir.1977); Sanford Bros. Boats, Inc. v. Vidrine, 412 F.2d 958 (5th Cir.1969). There is no error in the trial court's finding of Jones Act liability on the part of the defendant.
The trial court also concluded that Texaco had breached its duty under general maritime law to provide a seaworthy vessel. The court found that the D/B TERREBONNE BAY was unseaworthy because of defective equipment and lack of a competent crew. The law is well-settled that a shipowner has an absolute duty to provide a seaworthy vessel. In Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), the U.S. Supreme Court described this duty as follows:

*627 "[T]he owner is [not] obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." 362 U.S. at 550, 80 S.Ct. at 933.
The courts have repeatedly emphasized that liability based upon unseaworthiness is wholly distinct from liability based upon negligence. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971); Mitchell v. Trawler Racer, Inc., supra. The doctrine of unseaworthiness is not limited to the physical condition of the ship itself; an unfit crew may render a vessel unseaworthy. Boudoin v. Lykes Brothers Steamship Company, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955). However, mere individual acts of negligence do not necessarily create the conditions of unseaworthiness. As the United States Supreme Court noted in Usner v. Luckenbach Overseas Corp., supra:
"What caused the petitioner's injuries in the present case, however, was not the condition of the ship, her appurtenances, her cargo, or her crew, but the isolated, personal negligent act of the petitioner's fellow longshoreman. To hold that this individual act of negligence rendered the ship unseaworthy would be to subvert the fundamental distinction between unseaworthiness and negligence that we have so painstakingly and repeatedly emphasized in our decisions."
There was no evidence that Fontenot was inadequately trained or incompetent. Fontenot's single act of negligence cannot properly form the basis for a finding that the D/B TERREBONNE BAY was unseaworthy. However, there was an alternate basis for the trial court's finding of unseaworthinessdefective equipment.
A number of witnesses testified that the brake bands on the air hoist were completely worn out. There was testimony to the effect that workers on the rig occasionally used roofing paper or cord as a substitute for the brake bands. The evidence conclusively established that the air hoist was not functioning at the time of the accident. This defective brake constituted an unseaworthy condition.
Defendant contends that the defective brake was not a cause of plaintiff's accident, however, because Fontenot testified that he did not attempt to use it. The burden on the plaintiff to prove proximate cause in actions based on general maritime law is a light one, often referred to as "featherweight." Davis v. Hill Engineering, Inc., supra; Landry v. Two R. Drilling Company, 511 F.2d 138 (5th Cir.1975); Gilmore & Black, Admiralty (1957), sec. 6-36, page 311. In the instant case, we hold that plaintiff carried his burden of establishing a causal connection between the defective air hoist brake and his accident.
Russell Hebert, a former Texaco employee who worked as a driller aboard the TERREBONNE BAY, testified that the proper method of lowering the air hoist was to engage the brake, shift the throttle to neutral and ease off on the brake, lowering the load. Paul Montgomery, a petroleum engineer testifying on behalf of plaintiff, also testified that the brake should be used in this manner when lowering a load. In his testimony, Fontenot did concede that he did not apply the brake when lowering the drill pipe. However, he noted: "There wasn't any use. There weren't any brake bands, you couldn't stop it."
Thus, the fact that Fontenot did not attempt to apply the brake does not defeat the causal connection between the defective condition of the vessel and plaintiff's accident. Fontenot recognized the futility of attempting to use the brake. The evidence establishes that the proper method of lowering the air hoist was through use of the brake. The defective condition of the brake made safe operation of the hoist impossible. There is no error in the trial court's conclusion that the unseaworthy condition of the vessel caused plaintiff's injury.

*628 CONTRIBUTORY NEGLIGENCE
Defendant contends that the trial court erred in its finding that plaintiff was not contributorily negligent. Texaco maintains that Portier was negligent in standing underneath the suspended pipe. Under both the Jones Act and general maritime law, contributory negligence will not defeat a seaman's claim but may be considered as comparative negligence to mitigate the damages in proportion to the degree of plaintiff's negligence. Bobb v. Modern Products, Inc., 648 F.2d 1051 (5th Cir.1981). In Spinks v. Chevron Oil Company, 507 F.2d 216 (5th Cir.1975), the following principle was set forth:
"The duty owed by an employer to a seaman is so broad that it encompasses the duty to provide a safe place to work. By comparison, the seaman's duty to protect himself (the ground for any countervailing legal interest serving to exclupate the employer) is slight. His duty is to do the work assigned, not to find the safest method of work." 507 F.2d at 223 (citations omitted).
The trial court correctly decided the issue of contributory negligence. Portier was assigned the task of guiding the drill pipe into the elevator. Since that job required him to push on the pipe with his hands, it necessarily entailed his proximity to the pipe which was suspended over his head. We agree with the trial court's conclusion that plaintiff was as careful as possible under the circumstances and was not negligent.

AGGRAVATION OF PLAINTIFF'S INJURIES
Plaintiff's post-accident medical history was outlined by the trial court as follows:
"Immediately after the accident, plaintiff complained of a burning pain in his lower back. Plaintiff continued to work, but was switched to the less strenuous job of operating the air hoist. Following a restless night, he reported the incident to his superior.
"Medical attention was sought. One day after the accident, July 12, 1978, plaintiff was seen by Dr. Padraic Carmody for treatment. Dr. Carmody treated plaintiff until August, 1978, when he referred the plaintiff to Dr. Chris Cenac, an orthopedist. Dr. Carmody's diagnosis of plaintiff's condition was low back strain. Medication was prescribed. At one point, Dr. Carmody released plaintiff for light duty; however, plaintiff's low back pain reoccurred.
"Dr. Cenac confirmed Dr. Carmody's diagnosis of a low back, soft tissue injury. Due to continued subjective complaints by plaintiff, Dr. Cenac performed several tests including a EMG and nerve conduction study. The results of the tests were within normal limits, and plaintiff was released to go back to work with instructions to refrain from heavy lifting. Plaintiff's complaint of pain persisted, so a lumbar myelogram was scheduled and performed on November 14, 1978. As interpreted by Dr. Cenac and Dr. Jim Nelson, a radiologist, the myelogram and x-rays were normal. Plaintiff was directed to return to work.
"On subsequent visits to Dr. Cenac, plaintiff still had complaints of intermittent pain. Dr. Cenac referred plaintiff to Dr. Russell Grunsten for evaluation. Plaintiff saw Dr. Grunsten on April 30, 1979, and Dr. Grunsten conducted a physical examination, reviewed the previous studies, x-rays, and myelographic studies, and reviewed additional x-rays made at his request at the office of Dr. Schneider. Upon doing so, Dr. Grunsten discharged plaintiff to do his regular duties and activities. Two weeks later plaintiff saw Dr. Cenac who also returned plaintiff to work with no restrictions. Dr. Cenac examined plaintiff for the last time on July 5, 1979.
"Although the doctors' findings were negative, plaintiff still had complaints of pain. At this point, plaintiff consulted a chiropractor and began regular treatments, which continued from August 3, 1979 through September, 1979. Unable to obtain relief, plaintiff went to see Dr. Jerry Levine who referred him to Dr. Henry LaRocca, an orthopedic surgeon.
"On October 8, 1979, plaintiff was seen by Dr. LaRocca, who suggested a hospitalization *629 workup. Accordingly, plaintiff was admitted to Touro Infirmary in New Orleans on November 5, 1979, and remained until the 16th of November. Plaintiff underwent a physical examination; x-rays were taken; an epidural venogram test performed; and a genitourinary tract appraisal was run. A neurogenic bladder was diagnosed. (A neurogenic bladder is a bladder which is partially paralyzed.)
"A discograph also revealed that plaintiff's L-5/S-1 disc was abnormal. Surgery was performed to excise the L5/S-1 disc. The disc did not relieve plaintiff's pain. To treat the pain, Dr. LaRocca hospitalized plaintiff and treated him with an electronic stimulator device. The device sends electrical impulses to the skin and diverts the patient's attention from the pain. The device seemed to offer plaintiff some relief, and he was discharged from the hospital.
"On July 25th, 1980, plaintiff still complained bitterly of pain. A spinal fusion was considered and later performed. However, the fusion did not take. Since an attempt to re-fuse has even less chance of success than an initial fusion, plaintiff's prognosis is dim. He will have pain indefinitely, which will require that his back motion be restricted by the use of a brace. Twisting, bending, lifting, and sitting for prolonged periods of time will cause him pain; continued medication will be necessary."
Defendant contends that the plaintiff's physical difficulties are the result of an intervening cause, the manipulations of the chiropractor. Texaco maintains that it has no responsibility for any aggravation of plaintiff's injuries which stem from this treatment. The trial court concluded that the evidence did not establish an intervening cause or the malpractice of the chiropractor.
The only evidence relative to the chiropractic treatments was plaintiff's own lay testimony. Plaintiff testified that the chiropractor "cracked" his back nine or ten times. The chiropractor was not called as a witness and thus there was no testimony relative to the nature or extent of treatments received by plaintiff. It is also significant that Dr. LaRocca, the orthopedic surgeon who operated on plaintiff's back, attributed plaintiff's physical condition to the rig accident. After a thorough review of the evidence, we are unable to say that the trial court was clearly erroneous in concluding that the chiropractic manipulations did not aggravate plaintiff's condition.

PRODUCTIVITY FACTOR
During the course of his testimony, Melville Wolfson, an economist called by plaintiff, testified that Portier's salary would have increased at 5.75 percent annually over the span of his work life. Defendant objected to introduction of this evidence, arguing that this "productivity" increase was a disguised inflation factor. The trial court overruled defendant's objection and utilized this productivity factor in calculating defendant's loss of future wages.
On appeal defendant contends that the trial court erred in admitting and considering this productivity factor. Defendant renews its contention that this factor is in actuality an inflation consideration. Defendant relies upon the United States Fifth Circuit Court of Appeals' decision in Johnson v. Penrod Drilling Company, 510 F.2d 234 (5th Cir.1975), which held that the effect of inflation cannot be taken into account in computing a damage award. In response, plaintiff asserts that this productivity factor did not take into account the effects of inflation.
It is not necessary to characterize the nature of the productivity factor. In a recent decision, Culver v. Slater Boat Co., 688 F.2d 280 (5th Cir.1982), the Fifth Circuit overruled its prior decision in Johnson v. Penrod Drilling Company, supra. In doing so, the court used the following language:
"Our first conclusion, therefore, is that parties should be allowed, in future earnings damages cases, to present evidence not only of the interest rates available on safe investments, but also the likely wage increases that would have been obtained by the particular plaintiff in his occupation, *630 whether these likely increases are due to cost of living, promotions, merit raises or productivity." 688 F.2d at 308.
Therefore, even if the "productivity factor" was influenced by inflation, the trial court properly considered the evidence with regard to the likely wage increases that would have been obtained by plaintiff in his occupation.

INCOME TAX
In calculating the amount of plaintiff's award for loss of future wages, the trial court refused to consider the effect of income taxes. The trial court concluded that any consideration of the effect of income taxes would be too speculative.
Defendant points out that in Norfolk & W. Ry. Co. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), the U.S. Supreme Court held that the trial court erred in excluding the defendant's proffered testimony of an expert witness that the decedent's federal income taxes, during the period of lost future wages, would have amounted to a particular figure, which defendant wished to urge in reduction of damages. In concluding that such evidence was admissible, the Supreme Court stated:
"The amount of money that a wage earner is able to contribute to the support of his family is unquestionably affected by the amount of the tax he must pay to the Federal Government. It is his aftertax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family. It follows inexorably that the wage earner's income tax is a relevant factor in calculating the monetary loss suffered by his dependents when he dies." 444 U.S. at 493, 494, 100 S.Ct. at 757.
The Liepelt case arose under the FELA. The Jones Act incorporates the provisions of the FELA. 48 U.S.C. sec. 688. Thus, the Supreme Court's decision in Liepelt applies to the instant case and plaintiff's award for loss of future wages should have been based upon his after-tax earnings. See Fanetti v. Hellenic Lines Ltd., 678 F.2d 424 (2nd Cir. 1982).
The record reveals that Portier's gross income would have been subjected to an income-tax liability of 29 percent. The trial court awarded plaintiff $686,907.00 for lost future wages. That sum must be reduced to reflect plaintiff's tax liability. Accordingly, plaintiff's award for loss of future wages is reduced by 29 percent to $487,703.97 and plaintiff's total award will be reduced to the sum of $733,757.77.

PRE-JUDGMENT INTEREST
The district court awarded plaintiff pre-judgment interest from the date of judicial demand. Defendant asserts that this award was in error. It is true that in a Jones Act case brought on the law side interest may be awarded only from the date of judgment. Barrios v. Louisiana Construction Materials Company, 465 F.2d 1157 (5th Cir.1972); Sanford Bros. Boats, Inc. v. Vidrine, supra; Rains v. Diamond M. Co., 396 So.2d 306 (La.App. 3rd Cir.), cert. denied, 399 So.2d 623 (La.1981). However, plaintiff's case was brought under the general maritime law as well, and in such cases the award of pre-judgment interest is within the trial court's discretion. In the instant case, we find no abuse of that discretion in the award of pre-judgment interest.

DECREE
For the foregoing reasons, the judgment of the district court is amended to award plaintiff the sum of $733,757.77. In all other respects, that judgment is affirmed. All costs, both trial and appellate, are assessed against defendant-appellant, Texaco, Inc.
AFFIRMED AS AMENDED.
ON APPLICATION FOR REHEARING Rehearing denied.
WATKINS, J., is of the opinion that rehearing should be granted for the reasons assigned.
WATKINS, Judge, dissenting.
The applications for rehearing by appellee and appellant demonstrate that this court erred in reducing plaintiff's award for loss of future income by 29 percent. It was this court's intention to thereby allow plaintiff to recover his yearly net, rather than *631 gross, income for the remainder of his work-life expectancy in accordance with the dictates of Norfolk & W. Ry. Co. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980).
Both parties have demonstrated that the solution adopted (reduction of plaintiff's award by 29 percent) does not achieve this intended purpose. Appellant notes that Portier's future earnings award was based upon the assumption that he would receive annual salary increases of 5.75 percent. Appellant correctly points out that, because of the graduated system of income tax, Portier's tax liability will grow to exceed 29 percent of his gross income. On the other hand, appellee notes that in Liepelt the Supreme Court stated that the taxation of interest earnings from the investment of a lump-sum award is also a factor to be considered in determining a damage award.
Since the record before us does not contain the information necessary to take these factors into account in reaching an award for loss of future wages, I believe that this case should ultimately be remanded for the taking of additional testimony, limited to the issues discussed above.
NOTES
[1] Fed.R.Civ.P. 52(a) provides, in pertinent part, as follows:

"(a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."