526 So.2d 1206 (1988)
Earl B. McFARLAND, Plaintiff-Appellee,
v.
JUSTISS OIL COMPANY, INC., et al., Defendants-Appellants.
No. 87-219.
Court of Appeal of Louisiana, Third Circuit.
April 6, 1988.
*1207 Paul B. Wilkins, Columbia, for plaintiff-appellee.
Percy, Smith, Foote & Honeycutt, P.C., Steven C. Graalmann, Gist, Methvin, Hughes & Munsterman, David A. Hughes, Alexandria, for defendants-appellants.
Before GUIDRY, DOUCET and KNOLL, JJ.
GUIDRY, Judge.
On June 4, 1982, plaintiff, Earl B. McFarland, was employed as a roughneck by Justiss Oil Company, Inc. (hereafter Justiss) on its Rig 17. In April of 1982, Rig 17 had been temporarily attached to a pontoon barge owned by Flexa-Float Company of Houston, Texas, and leased by it to Placid Oil Company (hereafter Placid). Justiss leased Rig 17 and the necessary drilling crews to operate the drilling rig on Catahoula Lake in LaSalle Parish to Placid. Rig 17 was operated in this manner from April 23, 1982 until June 22, 1982, when it was removed from the pontoon barge and returned to land based operations.
McFarland was involved in an accident on June 4, 1982, following which Hartford Insurance Company (hereafter Hartford), the worker's compensation insurer of Justiss, began paying benefits to McFarland *1208 pursuant to the Louisiana Worker's Compensation Act, i.e., benefits at the rate of $183.00 a week plus medical and related expenses.
McFarland filed the instant suit against Justiss and Hartford seeking recovery of benefits under the Jones Act and General Maritime Law alleging himself to be a seaman working on a vessel in navigation. Justiss and Hartford answered generally denying McFarland's demands and particularly denying (1) that Catahoula Lake was navigable; (2) that McFarland was a seaman; and, (3) that McFarland had a cause of action under the Jones Act and general maritime law.
After a bench trial, judgment was rendered in favor of McFarland against Justiss and Hartford. The trial court concluded that McFarland was a seaman working on a vessel on navigable waters and thus had a cause of action under the Jones Act and General Maritime Law. The trial court found Justiss guilty of negligence and further found it responsible under the doctrine of unseaworthiness as the vessel owner pro hac vice. Plaintiff was found guilty of comparative fault to the extent of 20%. Pursuant to these findings, the trial court awarded plaintiff the net sum of $152,000.00 plus maintenance at the rate of $15.00 per day from June 4, 1982 to May 14, 1984, subject to a credit in favor of Justiss for worker's compensation benefits paid. The court awarded judgment for legal interest from date of judicial demand until paid.
Justiss and Hartford have perfected this suspensive appeal from that judgment urging the following errors:
1. The trial court erred in concluding that Catahoula Lake is navigable for the purpose of conferring Jones Act and Admiralty Jurisdiction.
2. The trial court erred in concluding that Earl B. McFarland was a seaman or member of a crew.
3. The trial court erred in concluding that Justiss Oil Company, Inc. was the owner pro hac vice of the pontoon barge and thus liable under the unseaworthiness doctrine.
4. The trial court erred in its assessment of percentages of liability.
5. The trial court erred in awarding pre-judgment interest on damages awarded for future loss.
Plaintiff answered the appeal urging trial error as follows:
1. The trial court erred in finding plaintiff 20% at fault.
2. The trial court erred in denying plaintiff's claim for punitive damages.
3. The trial court erred in awarding plaintiff maintenance at the rate of $15.00 per day rather than at the rate of $26.42 per day which plaintiff was receiving under the Louisiana Worker's Compensation law.
4. The trial court erred in ordering that defendants be given credit for the worker's compensation benefits paid to plaintiff, said credit to be applied first against the maintenance awarded and the excess, if any, to be applied against plaintiff's damage award.

FACTS
Plaintiff, Earl B. McFarland, went to work for Justiss in the late 1970s. He worked as a driller solely on land based rigs up until the slow down in the "oil patch" which resulted in the stacking of the rig on which he worked (Justiss Rig 8) on May 13, 1982. Shortly thereafter, on May 28, 1982, McFarland accepted the position of "roustabout" on Justiss Rig 17. Rig 17 had been leased by Justiss to Placid and had been mounted on a drilling barge made up of shallow draft pontoons which Placid had leased from Flexa-Float. The pontoons had been tacked together in order to accommodate the Justiss rig. As constructed, a ten foot wide opening referred to as a "keyway" or "spillway" was left in the middle of the front end of the barge. The keyway allowed the barge to be pushed over conductor pipes through which the drilling operations were conducted. Pipe racks were installed on each side of the keyway and a catwalk had been constructed over the opening. A hinged wire mesh grating covered the keyway near the center of the barge and 2 × 10 and 2 × 12 *1209 inch boards were provided to cover that portion of the spillway between the pipe rack and the front of the barge.
In the early morning hours of June 4, 1982, plaintiff was rolling drill pipe from the pipe racks onto the catwalk so that the pipe could be winched up to the rig floor. While engaged in this activity, McFarland stepped on a board covering the keyway, the board slipped out from under him and McFarland fell into Catahoula Lake sustaining injuries to his head and back. Plaintiff was 65 years old at the time of the accident; possessed a fourth grade education; and, had made his living by engaging in manual labor all of his life. Since June of 1982, he has been unable to work.
Plaintiff's action was filed in the state court pursuant to 28 U.S.C. § 1333. Federal substantive admiralty and maritime law applies to this action therefore, appellate review in this case is governed by Rule 52(a) of the Federal Rules of Civil Procedure. Lavergne v. Western Company of North America, Inc., 371 So.2d 807 (La. 1979); Kratzer v. Capital Marine Supply, Inc., 645 F.2d 477 (5th Cir.1981); Melancon v. I.M.C. Drilling Mud, 282 So.2d 532 (La. App. 1st Cir.), cert. denied, 283 So.2d 769, 771 (La.1973). Under federal law and jurisprudence, the findings of fact by the trial judge can not be disturbed unless they are clearly erroneous. Kratzer, supra; Melancon, supra. The federal "clearly erroneous" standard was explained by the U.S. Supreme Court in Guzman v. Pichirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962), as follows:
"The `clearly erroneous' rule of civil actions is applicable to suits in admiralty in general, McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954); see Roper v. United States, 368 U.S. 20, 23, 82 S.Ct. 5, 7 [7 L.Ed.2d 1] (1961), and to the existence of the operative facts of a demise charter party in particular, Gardner v. The Calvert, 253 F.2d 395, 399 (C.A.3d Cir.1958). Under this rule an appellate court cannot upset a trial court's factual findings unless it `is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)...."
See also Reed v. Seacoast Products, Inc., 458 So.2d 971 (La.App. 3rd Cir.1984). With the federal standard applicable to appellate review in mind, we turn to the issues presented on appeal.

NAVIGABILITY OF CATAHOULA LAKE
The trial court determined that Catahoula Lake is a navigable body of water for purposes of the Jones Act and federal maritime jurisdiction. We agree and adopt as our own the trial court's excellent written reasons on this issue.
"The first issue to be decided is whether or not Catahoula lake [sic] is navigable for Jones Act and Federal Maritime Jurisdiction. Catahoula Lake sustains much fluctuation in water level during the year. Because of this fact, DEFENDANTS argue that Federal Maritime Jurisdiction does not attach.
The issue has been previously litigated twice to the Court's knowledge. In Wilder v Placid Oil Company, 611 F.Supp. 841 (D.C.West.Dist.La.1985) the Court found Catahoula Lake to be navigable for Federal Maritime Jurisdiction. In Allen v Hartford Insurance Company, Docket No. 20,062 of this Court, the issue was raised in a jury trial. After a number of days of trial, the matter was settled and the jury released without reaching a conclusion.
Catahoula Lake is a relatively large body of water basically created by the drainage area of the Dudgdemona River and Castor Creek. These converges [sic] to form Little River west of the lake. Little River flows into the lake bed and leaves through various tributaries. Most of these tributaries then converge again into one channel (Little River) near Archie, Louisiana, East of the Lake. From the point of convergence, the River flows eastward into Black River. Black River then runs into Red River which in turn runs into the Atchafalaya River. From this point, one traveling the River would have unobstructed access to the intercostal *1210 [sic] waterways down the Atchafalaya River, or back into the Mississippi River all the way into the Gulf. East of the lake at Archie, Louisiana, the river is traversed by a weir which was constructed by the U.S. Corp of Engineers in 1972. This weir has a crest of 36 feet above sea level and does make travel up the river into the lake somewhat difficult.
Certain evidence used in the Allen case was filed in this matter by agreement of all parties to avoid unnecessary duplication. This included the testimony of Thomas W. Coon, Julian Thompson, and Hansford Kuhn as well as the deposition on written questions of Gaylon McGregor of the Corp of Engineers. All this testimony was addressed to the issue of navigability. From this testimony it is clear that numerous vessels have navigated into and on Catahoula Lake over the years. Thomas William Coon was the pilot on a self-propelled barge with a length in excess of 100 feet named the MISS FLORENCE. This vessel was not only piloted on the lake, but traveled through the water system from south Louisiana into and out of the Lake. Additionally, on numerous occasions Coon had been involved with the passage of crew boats as large as forty feet through the Black River system leaving and entering Catahoula Lake. Thompson had previously worked on the MISS FLORENCE and another self-propelled barge known as Barge No. 259 which operated in Catahoula Lake. Using the Mississippi River through the Catahoula Lake system, Mr. Thompson at one time had personally brought the MISS FLORENCE to Catahoula Lake from Buffalo Bayou in the State of Mississippi. He was also a witness to the forty (40) foot crew boats operating in Catahoula Lake having access to the Lake through the Black River system. Vernie A. Gibson (whose testimony was stipulated to) and Hanse Kuhn are elderly residents of LaSalle Parish who lived their lives in and around the shores of Catahoula Lake. They had used the Lake as well as the various tributaries described as commercial fishermen and trappers since as early as the 1930's. Mr. Gibson was even able to recall the days of steamboat traffic on Catahoula Lake and Black River.
Gaylon McGregor, in response to the written questions on deposition, indicated that the Corps. of Engineers construes Catahoula Lake to be a navigable waterway of the United States for the purpose of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. Section 401 etc. In one of the earliest cases to define navigability, the United States Supreme Court made the following finding:
Those rivers must be regarded as public navigable waters in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. The Daniel Ball v United States, 77 U.S. (10 Wall.) 57, 563, [sic] 77 U.S. (10 Wall) 557, 19 L.ed. 999 (1871).
In determining Catahoula Lake to be navigable, Judge Little of the Western District of Louisiana in the Wilder case relied on The Daniel Ball as well as other cases to conclude that Catahoula was navigable.
Judge Little found "navigable water" subject to admiralty jurisdiction to be defined as those navigable in fact, including man-made or artificial bodies of water, citing The Propeller Genesee Chief v Fitzhugh, 12 How. 443, 13 L.Ed. 1058 (1852), The Belfast, 7 Wall. 624, 19 L.Ed. 266 (1869), Ex parte Boyer, 109 U.S. 629, 3 S.Ct. 434, 27 L.Ed. 1056 (1884), The Robert W. Parsons, 191 U.S. 17, 24 S.Ct. 8, 48 L.Ed. 73 (1903), and Marine v. Dreyfus, 284 U.S. 263, 52 S.Ct. 166, 76 L.Ed. 282 (1932). The Court found the tests to be the same as The Daniel Ball supra.
. . . .
Given the evidence presented to the Court in this matter in applying the rationale as applied by Judge Little in the Wilder case, this Court can reach no conclusion but the fact that Catahoula *1211 Lake has been navigable in fact since at least the turn of the century, and is currently navigable in fact by drilling barges, crew boats, and work boats such that Catahoula Lake can only be construed as navigable for purposes of the Jones Act and Federal Admiralty Jurisdiction."

SEAMAN STATUS
The trial judge concluded, in well written reasons, that McFarland enjoyed seaman status. In disposing of this issue, the trial court stated:
"The law and jurisprudence is clear that a vessel is any water craft or other contrivance used or capable of being used as a means of transportation on water. The term includes a special purpose craft such as a barge or dredge which does not operate as a vessel for transportation but serves as a movable floating apparatus for drilling operations or the movement of cargo. In fact, the coverage of the Jones Act has been extended to almost any structure which floats or is capable of floating on navigable waters. See Offshore Company v Robinson, 266 Fed.2d 771, (5th Cir.App. 1959) and Producers Drilling Company v Gray, 361 Fed.2d 432 (5th Cir.App. 1966). DEFENDANTS raise no serious argument that the rig upon which the accident occurred is not a vessel, but do argue that the PLAINTIFF is not a seaman or a member of a crew. In doing so, they rely on the recent case of Barrett v Chevron U.S.A., Inc., 781 Fed.2d 1067 (5th Cir.App.1986).
Obviously, seaman status is a pre-requisite to any recovery under the Jones Act. Since the act does not specifically define the term, jurisprudential guidance is necessary to establish the definition.
In the Barrett case, the Court of Appeal attempted to evaluate the issue as to when an offshore oilfield worker is a seaman for the purposes of the Jones Act.
Barrett had been employed by a contractor who had contracted with Chevron Oil Company to provide welding crews for maintenance and repair work on offshore platforms in the Gulf of Mexico. For a year prior to the accident Barrett had worked for the contractor on a shift of fourteen (14) days on and seven (7) days off. During this time he was dispatched to various platforms in the field to work. Most of the platforms were sufficiently large to perform the required work without a standby vessel and seventy to eighty percent of Barrett's work was performed on the larger platforms. When Barrett was injured, he was working on a small fixed structure measuring ten by fifteen feet (10' × 15'), and because of the limited space was using a jack up barge positioned adjacent to the structure to provide work space. During this particular assignment, seventy to eighty percent of his time was spent on the jack up barge and not the fixed structure.
Barrett was transported daily from his living quarters on a fixed platform to the work area by a crew boat. While being transferred from the crew boat to the jack up rig by way of a personnel basket operated from a crane on the jack up rig, Barrett injured his back. The District Court found Barrett to be a Jones Act seaman. The majority of the 5th Circuit Court of Appeals en banc reversed this finding and in doing so made the following comment:
'Whether Barrett was a crew member should have been determined in the context of his entire employment as a welder's helper.......during his one year employment for Elliott he performed seventy to eighty percent of his work on platforms and no more than twenty to thirty percent of his work on vessels. Because he did not perform a substantial portion of his work aboard a vessel or fleet of vessels, he failed to establish that he was a member of the crew of a vessel.'
Id. at ___ [sic] pg. 1076
Effectively the 5th Circuit has established that the determination of status as a crew member or seaman should be made in the context of the entire employment of the individual and not just the *1212 particular incident giving rise to the accident. Reviewing the record in Barrett, the Court conceded that if the status were to be decided on the basis of the work of the days immediately before the accident, Barrett would have been a seaman. However, considering Barrett's entire vessel related work during his year of employment as a welder's helper, the overall record would not support a finding that he was a seaman.
In the case before this Court, it is clear that the PLAINTIFF meets the prior test of Offshore Company v Robison, 266 Fed.2nd 769 (5th Cir.App.1979) in that he was permanently assigned to the vessel and did a substantial portion of his work on the vessel. In doing so, his work contributed to the function or mission of the vessel.
The remaining facts relative to MCFARLAND's employment are essentially different from the BARRETT situation. As previously stated, PLAINTIFF did not continuously work for JUSTISS during the time in question. He became unemployed when his rig was stacked in May of 1982. He was re-employed in the position in which he was injured only because of an injury to another worker which created a vacancy. The new position placed MCFARLAND in a totally new work environment. Additionally, his land experience was that as a driller and his new experience on the vessel was that of a roughneck. In BARRETT, the employee's job classification, his status and responsibilities remained the same during the entire employment. The 5th Circuit recognized that the entire employment must be taken into consideration but further made the following statement concerning such evaluation:
'This is not an inflexible requirement, however, and does not preclude assessment of the extent of the employee's work aboard a vessel over a shorter time period if the employee's permanent job assignment during his term of employment has changed. If the plaintiff received a new work assignment before his accident in which either his essential duties or his work location is permanently changed, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new job.
Id. at ___ [sic] pp. 1075 and 1076
That being the case, the Court finds that MCFARLAND is entitled to seaman status for the purposes of Jones Act and General Maritime Law."
The district judge astutely recognized that when McFarland left his regular rig (Justiss # 8) and went to work, at a different job, on Justiss Rig 17 this constituted a new permanent job assignment at a new permanent job location. Thus McFarland was entitled to have his status as a seaman determined by examination of his new activities. Accordingly, we find no clear error in the trial court's finding McFarland to be a Jones Act seaman.

NEGLIGENCE OF JUSTISS
Plaintiff sought damages from Justiss and its insurer both under the Jones Act and under the general maritime law. In deciding this issue, the trial court commented as follows:
"Under the Jones Act, any negligence no matter how slight is sufficient to sustain a finding of liability. See Davis v Hill Engineering, Inc., 549 Fed.2nd 314 (5th Cir.App.1977); and Portier v Texaco, Inc., 426 So.2d 623 (1st. Cir.App. 1982). The employer has an obligation to `use reasonable care to provide the plaintiff with a safe place in which to work.' See Davis v Hill Engineering, Inc., supra.
The keyway through which PLAINTIFF fell was one which was a normal condition of a pontoon type rig. However, normally the width would only be four feet and was extended to ten feet on this rig because it was created simply by leaving out a ten foot (10') pontoon. It was suppossed [sic] to be boarded solid. At the time PLAINTIFF was injured, the boarding had been removed and the only thing traversing the opening was ...

*1213 [one] 2" × 12" board which was ... [laying at] a slant across the keyway.
... The workers were required to precariously work around the opening and on unsecured boards in order to exert the appropriate pressure necessary to move the heavy joints of pipe onto the cat walk and V-frame. There were no handrails which would have precluded the workers from falling into the open unprotected areas, and had the open area been covered the accident would not have occurred.
It is clear that the DEFENDANT has breached its duty to provide its employee with a safe place in which to work and therefore is liable for damages under the Jones Act."
The record in this case fully supports the trial judge's conclusion that Justiss breached its duty to provide plaintiff with a safe place to work and this breach of duty was the proximate cause of the accident and McFarland's injury. According to federal jurisprudence, the slightest negligence is sufficient to sustain a finding of Jones Act liability. Accordingly, the trial court's finding on this issue will not be disturbed.
Plaintiff also sought damages under the general maritime law claiming that his employer, Justiss, was the owner pro hac vice of the rig and vessel and thus is responsible in damages for unseaworthiness. The trial court so held and appellants assert error in this conclusion.
The obligation of warranty of seaworthiness is owed by the vessel, in rem, and by the vessel owner or the owner pro hac vice, in personam. Under the doctrine of unseaworthiness, a seaman is entitled to maintenance and cure from the shipowner-employer and for damages resulting from an unseaworthy condition. When an unseaworthy condition is established, the owner or the owner pro hac vice of the vessel is absolutely liable for any injury sustained by a crew member in the course of his employment.
We previously determined that the trial court did not err in finding that plaintiff enjoyed seaman status and Justiss was guilty of Jones Act negligence. Plaintiff is thus entitled to recover maintenance and cure from his employer, under general maritime law, and is also entitled to recover damages under the Jones Act. Therefore, the issue concerning whether Justiss, under the circumstances present, is also a pro hac vice owner of an unseaworthy vessel is academic and will not be addressed. See Solet v. M/V H.V. Dufrene, 303 F.Supp. 980 (E.D.La.1969); Sims v. Marine Catering Service, Inc., 217 F.Supp. 511 (W.D.La. 1963).

COMPARATIVE FAULT
Both parties complain about the percentage of fault assessed them by the trial judge. The respective duties of an employer and a seaman were discussed by the U.S. Fifth Circuit Court of Appeal in Thezan v. Maritime Overseas Corporation, 708 F.2d 175 (5th Cir.1983), cert. denied, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984), wherein the court stated:
"In contrast to the broad duty imposed upon a vessel owner [employer] to supply a safe work place, the seaman's duty to protect himself is slight. Ceja v. Mike Hooks, Inc., 690 F.2d 1191 (5th Cir.1982). But the duty does exist."
At the time of the accident, plaintiff was approximately 65 years old and had worked at various positions in the oil field for more than 30 years. It would have taken little effort on his part to check the stability of the board across the keyway or to have by himself, or with the help of others, placed and secured boards over the opening. On the other hand, it is evident that Justiss recognized that the open keyway was hazardous to the workers as it provided boards to cover this obstacle. A post-accident report prepared by E.D. Mills, the toolpusher on the rig, reflects that under the section labeled "What should be done?", he stated "boards should be put across the keyway so that the keyway is completely covered"; and under the section headed "What have you done thus far?", he reported "boarded the keyway solid".
Considering the relative burdens of the parties involved and the facts revealed by the record, we find no clear error in the trial judge's conclusion that plaintiff was
*1214 20% and Justiss 80% at fault in causing McFarland's injuries.

MAINTENANCE AND CURE
In his answer to the appeal, plaintiff argues that: (1) the district court erred in denying his prayer for punitive damages against Hartford for discontinuing his worker's compensation (maintenance and cure) payments on June 7, 1984; (2) worker's compensation payments he received should not have been credited against the maintenance and cure and/or the general damages awarded; and, (3) the maintenance and cure award of $15.00 per day was too low and should be increased to equal the worker's compensation rate of $26.14 per day ($183.00 per week ÷ 7 days per week) received by plaintiff.
Maintenance and cure are due a seaman who is injured in the service of the vessel. It is an obligation of the employer arising out of the contract of employment and is independent of any liability under either the Jones Act for negligence or the doctrine of unseaworthiness. Baker v. Raymond International, Inc., 656 F.2d 173 (5th Cir.1981); Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). The purpose of maintenance and cure is to provide the ill or injured seaman with food and lodging from the time he becomes incapacitated until the time he reaches maximum medical recovery (maximum cure). Vaughan v. Atkinson, supra.
Although plaintiff, in his answer to appeal, alleged the trial court erred in awarding maintenance at a rate of $15.00 per day rather than at the rate worker's compensation was paid ($26.14 per day) he failed to brief this alleged error. Therefore, in accordance with Rule 2-12.4, Uniform Rules Courts of Appeal, we consider this allegation abandoned.
Plaintiff next complains that the trial judge erred in ordering that defendants receive credit for benefits paid to McFarland as worker's compensation. When plaintiff filed this suit, he chose to recover against his employer under the Jones Act and under general maritime law. Worker's compensation is not recoverable under either. To allow plaintiff to recover under both the federal and the state systems for maintenance and cure and worker's compensation would constitute double recovery. Further, considering plaintiff's election of remedies, any amounts paid by Justiss and its insurer should be offset against plaintiff's total recovery. Accordingly, we find the trial judge's ruling correct.
Finally, we discern no error in the trial court's ruling on the issue of punitive damages. Punitive damages are allowed under the general maritime law upon a showing of willful and wanton misconduct. Reed v. Seacoast Products, Inc., supra. The award of punitive damages is a harsh remedy which is normally not favored by law. Creamer v. Porter, 754 F.2d 1311 (5th Cir.1985). The purpose of punitive damages is not to compensate the plaintiff, but to punish behavior on the part of the defendant which the court finds reprehensible and which the court would encourage other parties, similarly situated, to avoid. The decision, then, whether or not to award punitive damages, and the amount of such damages, if they are to be awarded, rests within the sound discretion of the trier of fact. Silver v. Nelson, 610 F.Supp. 505 (D.C.La.1985).
In the present case, Hartford temporarily terminated McFarland's benefits on June 7, 1984, based on the following May 14, 1984 progress note by Dr. Frank Cline:
"This man comes back with his usual complaints. He is still apparently losing weight slowly. He is complaining of mutiple [sic] areas of his back, arms and headaches. He is still seeing Dr. Winters once a week for treatment.
At this time I feel that we have given this man plenty of time to recover from the soft tissue aggravations that he had following his fall nearly two years ago, and I feel that at this time his principal complaints are not related to his injury, and that they are related to this arthritis.
I feel that it is appropriate for him to continue seeing Dr. Winters for his general medical treatment and treatment of *1215 his arthritis, but at this time I do not think he needs my services any more.
I do not think this man will be able to return to oil field work due to his arthritic condition and his advanced age, but I feel that there would be substantial work that he could accomplish in the work force of a lighter less strenuous nature than oil field work.
I have asked him to return to see me only if Dr. Winters refers him back."
After further investigation, plaintiff's benefits were reinstated and all back payments were made current as of July 20, 1984. The trial judge did not find Hartford's behavior so reprehensible as to justify the award of punitive damages. We find no clear error in this decision and find this alleged error without merit.

PRE-JUDGMENT INTEREST
Although pre-judgment interest is not recoverable in a Jones Act suit brought on the law side, i.e., tried to a jury, such is not the case where a Jones Act action is brought under the court's admiralty jurisdiction (tried to a judge) where the award of pre-judgment interest lies within the sound discretion of the trial judge. Doucet v. Wheless Drilling Company, 467 F.2d 336 (5th Cir.1972); Williams v. Reading and Bates Drilling Co., 750 F.2d 487 (5th Cir.1985).
Appellant claims that the trial court erred in awarding interest from the date of judicial demand on the total amount awarded. In brief, Justiss argues that:
"In Pickle v. International Oilfield Diver's Inc 791 F.2d 1237 (5th Cir.1986) the [district] court stated that it is appropriate to award pre-judgment interest on sums awarded for past losses because this is `compensation for the use of funds to which the claimant was rightfully entitled.' However the Court of Appeal stated that the trial court had:
1... erred by awarded [sic] pre-judgment interest on damages for loss of future income and for future pain and suffering.'
and therefore the court vacated that portion of the judgment and remanded the matter to the trial court:
'... to reconsider the award of prejudgment interest on post judgment losses.'"
The preceding argument is taken out of context; the Pickle court actually stated the following:
"... An award of prejudgment interest in an admiralty case is within the district court's sound discretion, e.g., Williams v. Reading & Bates Drilling Co., 750 F.2d 487 (5th Cir.1985); Curry v. Fluor Drilling, and does not depend on evidence of delay. `In fact, generally in maritime law, prejudgment interest should be awarded.' Curry v. Fluor Drilling, 715 F.2d [893] at 896 [(5th Cir.1983)] (citations omitted). See also Ceja v. Mike Hooks, Inc., 690 F.2d 1191, 1196 (5th Cir.1982) (`As a general rule, prejudgment interest should be awarded in admiralty casesnot as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled.'). The district judge found no `peculiar circumstances' that would make it inequitable to assess prejudgment interest, thereby accurately tracking the law of the circuit, see Doucet v. Wheless Drilling Co., 467 F.2d 336, 340 (5th Cir. 1972). We find no abuse of discretion in the award of prejudgment interest on damages for all losses that occurred prior to trial.
IOD further maintains that the court erred by awarding prejudgment interest on damages for loss of future income and for future pain and suffering. That challenge is meritorious as it relates to the interest on damages for future pain and suffering. Agreeing with IOD's argument on this point, we must vacate so much of the judgment as is necessary to empower the district court on remand to reconsider the award of prejudgment interest on post-judgment losses.
We therefore vacate that part of the judgment and remand this question to the court a quo for a recalculation of prejudgment interest, excluding therefrom interest on future, unaccrued *1216 non-economic damages." (Emphasis ours).
The court in Pickle, supra, was careful to point out that in an admiralty case pre-judgment interest is awardable except on future, unaccrued non-economic damages. In its written reasons for judgment, the trial court itemized its award of damages as follows:

"General damages including
physical and mental pain, suffering,
discomfort, anguish distress
and emotional disturbance $ 85,000.00
Loss of income, past and future 75,000.00
Medical expenses present and
future 30,000.00
 ___________
 $190,000.00
Less deduction for Plaintiff's
negligence 38,000.00
 ___________
TOTAL RECOVERY $152,000.00"

The only item of non-economic damages is the award for physical and mental pain, suffering etc. Although the trial judge did not specifically indicate that the award of general damages was made for both past and future pain and suffering, we believe this conclusion to be obvious. Since under Pickle, supra, plaintiff is not entitled to pre-judgment interest on future non-economic damages, we will remand this matter to the trial court to allow the trial court to determine how much of the general damage award of $85,000.00 represents post-judgment recovery and thereafter to recalculate its interest award excluding any interest on future non-economic damages. Pickle, supra.
For the above and foregoing reasons, we amend the judgment of the trial court disallowing pre-judgment interest on such portion of the net general damage award of $68,000.00 which represents post-judgment recovery and remand this matter to the trial court for such determination. In all other respects, the judgment of the trial court is affirmed at appellants' costs.
AFFIRMED AS AMENDED AND REMANDED.