647 So.2d 371 (1994)
James A. ALLEMAN, Plaintiff-Appellee,
v.
BROWNIE DRILLING CO., et al., Defendants-Appellants.
No. 93-1668.
Court of Appeal of Louisiana, Third Circuit.
November 23, 1994.
Rehearing Denied January 18, 1995.
*373 Russell T. Tritico, Lake Charles, for James A. Alleman.
Robert W. Clements, Lake Charles, for Brownie Drilling Co., Etc.
Donald Coleman Brown, Lake Charles, for Amoco Production Co.
Before LABORDE, KNOLL, THIBODEAUX, SAUNDERS and PETERS, JJ.
SAUNDERS, Judge.
In this maritime tort case, the trial judge, by directed verdict, ruled that plaintiff, James A. Alleman, was a Jones Act seaman. After a jury trial, judgment was rendered in favor of the plaintiff. The trial judge denied the drilling company's Motion for Judgment Notwithstanding the Verdict or, in the alternative, for a new trial or remittitur, maintaining the jury's award to plaintiff of substantial damages against his drilling company employer for lost wages, lost future earnings, and general damages. We affirm, except to eliminate prejudgment interest and reduce plaintiff's award for lost future earnings to five years post-trial, beyond which no corroborative medical evidence was adduced to substantiate his claim. See Coco v. Winston Ind., 341 So.2d 332 (La.1976); Aisole v. Dean, 574 So.2d 1248, 1252 (La.1991) and cites therein.

FACTS
Plaintiff, James A. Alleman, filed suit under the Jones Act for injuries sustained while working for Brownie Drilling Company (Brownie) as a roughneck on a barge outfitted with a workover rig in Black Lake, Cameron Parish, on February 17, 1988. The truck-mounted workover rig had seen no land work for some three years, during which time it was used solely in connection with the barge GROSBECK. The rig was owned by Brownie, which also supplied the crews and handled the rig's frequent moves from site to site.
On the day of the accident in question, plaintiff, ordinarily a motorman, worked on the rig floor as a roughneck. He and the other hands had already replaced iron pipes in the drill hole and were working with fiberglass stands when, suddenly and without notice, plaintiff was struck forcefully by equipment used by Brownie to replace the pipe stands in the hole.
As a result of the accident, plaintiff sustained lacerations to the front and back of his head, a non-displaced skull fracture, a concussion, and a strain to the cervical spine. He was hospitalized for five days and treated over the next two and one-half years by some ten physicians. The skull fracture healed without surgical intervention and plaintiff was released by his physicians to return to work within the year. Although plaintiff was treated and released by ten physicians, none was able to locate the source of his continuing complaints of back pain, headaches and dizziness.

*374 LITIGATION HISTORY

Plaintiff filed suit against Brownie Drilling Company and Amoco Production Company (Amoco) under the Jones Act and general maritime law, requesting and obtaining a jury trial. Employed by Brownie as a permanent member of its Workover Rig No. 17, plaintiff sued Brownie under the Jones Act for the alleged negligence of the driller and for maintenance and cure. Plaintiff also sued Amoco as owner of the barge GROSBECK on which the Brownie rig was situated, for unseaworthiness of the barge.
Amoco's specialized barge outfitted with Brownie's truck-mounted workover rig was frequently moved from one well site to another. After the rig was moved by Brownie personnel to a particular location, its crew would sink the barge to the lake bottom.
At trial, plaintiff testified as to the accident's occurrence and persistence of his injuries. He stressed the hurry that the Brownie crew was in to finish the job that day so that it could move to another location, that the supervising driller ignored plaintiff's notice that the metallic cap attached to the movable hook or hoist overhead lacked one of its two moving screws, and that the driller too abruptly lowered or braked the descending type elevator. Coworkers corroborated his account that a cap screw was missing before his accident, that the cap fell off at the time of the mishap, and that the accident was accompanied by a noise previously unknown to any of the crew members.
Additionally, plaintiff's father and wife testified that they did not believe plaintiff had been malingering. These family members further supported plaintiff's contention that, although his condition had improved, plaintiff continued, as of the date of trial, to have fairly frequent headaches and lower back pains.
Brownie, through the sole eyewitness to the actual impact, countered that plaintiff was struck in the head by the elevator, not by flying debris. According to the driller charged with lowering and braking the elevator, two strands of fiberglass tubing became separated when the descending stand hit a "tight spot" caused by a subterranean imperfection in the drill hole. He believed that when the stand hit the "tight spot," the elevator descended more quickly than the fiberglass tubing, causing the tubes to become separated from the elevator.
The trial court granted plaintiff's Motion for Directed Verdict on the issue of seaman's status and Amoco's Motion for Directed Verdict on the issue of unseaworthiness. The only issues to reach the jury concerned Brownie's negligence, plaintiff's damages, and the date legal interest would commence.
After a short recess, the Cameron Parish jury returned a verdict finding Brownie negligent and awarded plaintiff: $125,000.00 for five years lost wages, from date of accident through May 25, 1993, the date of its verdict; $500,000.00 in lost future earnings; $300,000.00 for physical pain and suffering and mental anguish up to date of trial; and $75,000.00 for future disability, physical pain and suffering and mental anguish. Finally, the jury concluded that interest should begin from the date of accident, not from date of judicial demand or date of judgment.

APPELLATE POSTURE
This appeal followed the trial court's denial of Brownie's Motion for a Judgment Notwithstanding the Verdict or, Alternatively, a New Trial.
Defendant Brownie Drilling Company initially maintains that the trial court erred in finding that plaintiff was a Jones Act seaman and in removing the question from the jury. Additionally, Brownie maintains that the trial court erred in finding Brownie liable, and in refusing to upset the jury's award. Brownie also contends that the trial court erred in not reducing the legal interest awarded by the jury.
Finally, Amoco Production Company, the owner of the barge against whom the trial judge dismissed the claims of unseaworthiness, contests the trial court's refusal to require Brownie to reimburse it for attorney's fees and other defense expenses it incurred pursuant to an assumption and indemnity agreement between it and Brownie.

*375 JUDGMENT NOTWITHSTANDING THE VERDICT

"The Louisiana Supreme Court, in Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, at page 832 (La.1991), discusses the criteria to be used in determining when a motion for JNOV is proper:
`A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Scott [v. Hospital Service District No. 1,] supra [496 So.2d 270 (La.1986)]. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e., do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.'"
Gray v. Texaco, Inc., 610 So.2d 1090, 1093 (La.App.3d Cir.), writ denied, 616 So.2d 686, 687 (La.1993).

Seaman Status
After thoroughly reviewing the testimony and exhibits, like the trial judge, we conclude that the facts and inferences point so strongly and overwhelmingly in favor of plaintiff's seaman's status that the jury could not have arrived at a contrary conclusion.
"The Jones Act provides that `Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law....' 46 U.S.C.App. § 688.
The court in Wilkerson v. Teledyne Movible Offshore, Inc., 496 F.Supp. 1279, 1282-1283 (E.D.Tex.1980), defined seaman as one who:
"`(1) [has] a more or less permanent connection with (2) a vessel in navigation and (3) the capacity in which he is employed or the duties which he performs must contribute to the function of the vessel, the accomplishment of its mission or its operation or welfare in terms of its maintenance during its movement or during anchorage for its future trips.' (Citations omitted.)"
Gray, supra, at 1094.
Under the facts as presented, there can be no question that plaintiff was permanently connected to the barge GROSBECK or that the fulfillment of his duties contributed to the function of the barge. Plaintiff had been assigned to the workover barge for two and one-half years, and his responsibilities as both motorman and floorhand were both directly connected to the vessel's mission of enhancing or reactivating inland mineral production.
Nor, under the circumstances and in light of the evidence, is there any question that the barge GROSBECK constitutes a vessel for Jones Act purposes.
"The law and jurisprudence is clear that a vessel is any water craft or other contrivance used or capable of being used as a means of transportation on water. The term includes a special purpose craft such *376 as a barge or dredge which does not operate as a vessel for transportation but serves as a movable floating apparatus for drilling operations or the movement of cargo. In fact, the coverage of the Jones Act has been extended to almost any structure which floats or is capable of floating on navigable waters. See Offshore Company v. [Robison], 266 F.2d [769] 771, (5th Cir. App.1959) and Producers Drilling Company v. Gray, 361 Fed.2d 432 (5th Cir.App. 1966)."
McFarland v. Justiss Oil Company, Inc., 526 So.2d 1206, 1211 (La.App.3d Cir.1988) (quoting trial judge).
Thus, although as a general proposition, a directed verdict on the issue of seaman's status is inappropriate, Folse v. Western Atlas Intern., Inc., 593 So.2d 341, 343 (La.1992), nonetheless, "... a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." McDermott International, Inc. v. Wilander, 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991). As the facts and the law are clear in this case, we affirm the trial court's directed verdict that plaintiff was a Jones Act seaman.

NEGLIGENCE
Next, we turn to Brownie's argument that it should not have been found liable for plaintiff's injuries.
In a Jones Act case, the plaintiff's burden of proving causation is "featherweight." Babineaux v. Lykes Bros. S.S. Co., Inc., 608 So.2d 659, 662 (La.App.3d Cir.1992), writ denied, 610 So.2d 819 (La.1993), citing Alverez v. J. Ray McDermott and Co., 674 F.2d 1037 (5th Cir.1982); Davis v. Hill Engineering, Inc., 549 F.2d 314 (5th Cir.1977). Any negligence, no matter how slight, is sufficient to sustain a finding of liability. Barks v. Magnolia Marine Transport Company, 617 So.2d 192, 194 (La.App.3d Cir.), writ denied, 620 So.2d 876 (La.1993), citing McFarland, supra. Moreover, in suits brought under the Jones Act and general maritime law, findings of fact by the trial court are not to be disturbed unless they are clearly erroneous. McAllister v. U.S., 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); McFarland, supra. See generally, Johnson v. Offshore Exp., Inc., 845 F.2d 1347, 1352 (5th Cir.1988).
These rules govern actions brought in any intermediate appellate forum.
"A Louisiana appellate court's standard of review of the decision of the finder of fact in a suit under the Jones Act, is the same limited standard as that of the federal courts. Trahan v. Gulf Crews, Inc., 260 La. 29, 255 So.2d 63 (La.1971). Under federal law and jurisprudence, an appellate court cannot disturb the finding of fact on the merits unless there is no reasonable evidentiary basis for the fact found. Id."
Barks, supra, at 194.
Reviewing the evidence in light of the relaxed burden of proof and strict standard of appellate review for Jones Act cases, we find no basis for disturbing the jury's conclusion that Brownie Drilling Company, Inc. was 100% liable for plaintiff's injuries. Plaintiff presented evidence to indicate that he had personally informed Brownie's driller in charge that a metallic cap on the "rod hook" was missing one of two screws which fastened it in place, but that his warnings were overlooked or ignored. Second, each of the workers present, including Brownie's witness, testified that the fiberglass rods abruptly became severed moments before plaintiff was struck by the elevator, or metallic cap, or both. The jury concluded from all of the evidence presented that plaintiff's injuries are wholly attributable to the driller's hasty lowering, or abrupt braking, of the descending stand of fiberglass tubing, or to his failure to insert a second cap screw before recommencing the obviously hazardous mission of the crew, motivated perhaps by his zeal to quickly conclude the job to please his absent supervisor. Under the applicable standards of appellate review, like the trial judge, we are unable to find that the jury erred in accepting plaintiff's version of events over that presented by defendant, as its findings and apportionment of fault are far from clearly wrong.

QUANTUM
"It is well settled that the trier of fact has much discretion in awarding damages. *377 Boswell v. Roy O. Martin Lumber Co., Inc., 363 So.2d 506 (La.1978). As a reviewing court, we cannot disturb the trier's award absent an abuse of discretion. Andres v. Liberty Mutual Insurance Co., 568 So.2d 651 (La.App. 3rd Cir.1990). In determining whether the trier of fact has abused its much discretion in its award, the appellate court must first examine the individual circumstances of the particular case and not prior awards. Reck v. Stevens, 373 So.2d 498 (La.1979); Andres, supra."

Jenkins v. Kerr-McGee Corp., 613 So.2d 1097, 1102 (La.App.3d Cir.), writs denied, 616 So.2d 701, 702 (La.1993).

Lost Wages
Plaintiff, James A. Alleman, a 20 year old man at the time of the accident, testified that the blow that left him disoriented on February 17, 1988, produced back and neck pains and dizziness, which, although occurring less frequently than originally, persisted through the date of his trial in May 1993.
In choosing to award plaintiff $125,000.00 for lost wages from the date of the 1988 accident until his 1993 trial, the jury was clearly convinced that notwithstanding his medical discharges by no less than ten medical providers of his choosing, plaintiff nonetheless remained disabled from employment for some or all of the five years at issue.
"A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong.' Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
"This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
"Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La. 1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. Esco, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this Court has emphasized that `the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Housley v. Cerise, 579 So.2d 973 (La. 1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
"This court has recognized that `[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and *378 appellate functions between the respective courts.' Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id."

Stobart v. State, through DOTD, 617 So.2d 880, 882-83 (La.1993).
Under the circumstances, we are unable to say that the record furnishes no reasonable basis for the jury's conclusion. Plaintiff, his father, and his spouse each provided sufficient testimony on the subject, and the jury was not clearly wrong in accepting this testimony in preference to the previously attained medical discharges placed into evidence by defendant. Such findings, based on determinations regarding the credibility of witnesses, demand great deference, for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra, at 844 and extensive cites therein.
Although the $125,000.00 figure awarded for lost wages between 1988 and 1993 does not square perfectly with plaintiff's approximately $22,000.00 in pre-injury annual earnings, there was testimony to suggest that plaintiff's promotion to driller or even tool pusher could not have been ruled out in the absence of his injury.

Lost Future Earnings
The jury further awarded plaintiff $500,000.00 for lost future earnings.
"To obtain an award for future loss of wages and/or loss of earning capacity, a plaintiff must present medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the accident. Bize v. Boyer, 408 So.2d 1309 (La.1982); Naman v. Schmidt, 541 So.2d 265 (La.App. 4th Cir.1989); Holman v. Reliance Ins. Co., 414 So.2d 1298 (La.App. 2nd Cir.1982), writ denied, 420 So.2d 164 (La.1982)."

Aisole v. Dean, at 1252. See also, Bordelon v. South Cent. Bell Telephone, 617 So.2d 1337, 1342 (La.App.3d Cir.1993).
The record contains no medical evidence indicating residual disability to support the magnitude of the award given by the jury, even inferentially. Although none of the medical practitioners who treated plaintiff accused him of malingering, none could find reason to continue his treatment. Therefore, the magnitude of the jury's award for future lost earnings cannot stand, even deferring to the jury the great discretion to which it is entitled. See generally, Aisole, supra; Stobart, supra, at 882-83; Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993); and Reck v. Stevens, supra.
Following plaintiff's five day hospitalization, treating physician Dr. W. Ledet discharged plaintiff and released him to work on April 25, 1988, some two months following the accident, noting that plaintiff had sustained a linear skull fracture, lacerations, post-concussion vertigo and headaches, and a cervical strain. After being released by Dr. Ledet, plaintiff saw Dr. William Foster.
Dr. Foster found no objective neurological symptoms in plaintiff, who was discharged from his care in November of 1988. Dr. Foster informed plaintiff that he was confident plaintiff's subjective symptoms would subside and that it would not be an incapacitating injury, although the symptoms might persist for sometime.
Before discharging plaintiff in November 1988, Dr. Foster referred plaintiff to Dr. Charles Ray Karam, an Otorhinolaryngologist, and Dr. Alex LaCoste, an Ophthalmologist, neither of whom could find anything wrong with plaintiff. Dr. Foster also referred plaintiff to Dr. Fayez Shamieh, a Neurologist, whose examination of plaintiff was also within normal limits.
Dr. Gerald Litel's neurological examinations of plaintiff soon after the accident and in February of 1989 on referral from Dr. Shamieh, both showed normal. As of July 1991, Dr. Litel thought it very unlikely that plaintiff's accident-related symptoms would persist.
Next, plaintiff saw Dr. Clark Gunderson on August 22, 1989. Dr. Gunderson prescribed an MRI, which he interpreted two weeks *379 later to indicate no disc injury or significant neurological injury. When Dr. Gunderson discharged plaintiff, he concluded that plaintiff's neck pains, those which were believed to be most severe, were soft tissue related and would resolve themselves over an indeterminate period of time.
Plaintiff's complaints continuing, his attorney referred him to Dr. John Jackson, a New Orleans Neurosurgeon, whose examination appeared normal: plaintiff's continuing complaints of pains and disability could not be related to any neurosurgical problem.
Plaintiff next saw psychiatrist/psychologist Dr. Aretta Rathmell. Under the impression that plaintiff's cervical and lumbar pains persisted, she believed plaintiff's psychological problems were caused by the pain, the uncertain future he faced, and his uncertain marital situation. By May 7, 1990, Dr. Rathmell believed plaintiff's depression was greatly improved and his anxiety largely removed. After reviewing psychological test results, Dr. Rathmell on July 10, 1990, offered her opinion that plaintiff's memory and concentration problems were chronic and had "been there in the form of learning disabilities since early childhood and were not caused by the accident." She thought that his depression had been resolved by July 1990, but that his marriage concerns were present and still a source of instability. Believing her efforts to help plaintiff with his depression and inability to tolerate the pain successfully concluded, she referred plaintiff and his spouse to a marital specialist at the local Catholic Diocese. On October 16, 1991, this time on referral by defendant, Dr. Rathmell saw plaintiff one more time, learned that plaintiff and his wife had reconciled, and found him to be completely recovered.
As to future lost earnings, in light of Aisole, supra, we believe that the highest award for lost future wages that is reasonable under the circumstances is $125,000.00, a sum sufficient to compensate plaintiff for an additional five years beyond the date of trial which is an extremely generous award and represents the maximum award a reasonable jury could have awarded under the circumstances. See generally, Coco v. Winston Ind., Inc., supra. See also, Youn, supra, at 1260. Plaintiff's complaints of continuing soft tissue injuries not only defied the diagnosis of ten medical practitioners selected by plaintiff or his representatives, but all of his symptoms, even by the admission of plaintiff and his witnesses, had begun to resolve themselves. Indeed, each of the treating physicians discharged plaintiff long (circa four years) before his case went to trial.
The only medical evidence, Aisole, supra, which supports even the remote possibility that plaintiff's symptoms might continue longer than one year post-accident is attributable to Dr. Foster:
"(Q) Did you have any further recommendations for Mr. Alleman on June 21st [1988] other than what we have already discussed from your report?
(A) No, I told him that I felt that these things would subside.
(Q). Yes.
(A) And that he would get better and it would not be a permanent problem. I reassured him to that point, and that's a normal course and symptoms like that can last for several weeks, several months, and they can last a lengthy period of time, but I did tell him that I didn't feel that this would be an incapacitating type injury. He would get well and be able to go back to work, and that's where I left it."
Having examined all the evidence, including the lay testimony offered by plaintiff and his family, we believe that Dr. Foster's 1988 impression, at best, might warrant future loss wages of $125,000.00 for five years which, although on the high side, is within the limit of the vast discretion allowed to the trier of fact. Compare, Bize v. Boyer, supra, at 1311-12; Jenkins v. Kerr-McGee, supra, at 1104.

LASHA NOT CONTROLLING
In his brief, plaintiff contends that Aisole, supra, is not applicable in the wake of Lasha v. Olin Corp., 625 So.2d 1002 (La.1993), wherein the Louisiana Supreme Court in a different context noted the impropriety of requiring that a party plaintiff show causation by a "reasonable medical certainty." Absent some further expression on the subject *380 of lost future wages by the Supreme Court, however, we assume that its pronouncements in Aisole remain valid. The Supreme Court in Lasha did not recant the "reasonable certainty" standard enunciated in Aisole, supra, at least as to lost future earnings. Rather, Lasha reiterates the rule that a plaintiff ordinarily must prove every essential element of his case by a simple preponderance, not by some artificially created greater standard. Id., at 1004-05, citing, inter alia, Jordan v. Travelers Ins. Co., 245 So.2d 151 (La.1971) (tort victim diagnosed permanently disabled by treating physician due to tort-caused condition entitled to lost future earnings, although lost earnings shown only by lay testimony).

General Damages
Next, we turn to the $300,000.00 awarded plaintiff for physical pain and suffering and mental anguish from the date of his injury through trial.
"The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award."
Youn, supra, at 1261.
The jury clearly believed plaintiff sustained soft tissue injuries which persisted beyond the date of his medical discharges and, indeed, up to and beyond the date of trial. More importantly, the jury was apparently convinced from the testimony of plaintiff, his wife and his father that plaintiff's injuries, although temporary, entangled him emotionally. The testimony on the subject suggested that plaintiff was very active and led an essentially normal rural life prior to the mishap, working with cattle and in the garden, but that after its occurrence he was relegated to drinking coffee and lying or sitting on the couch and watching television and was financially dependent on his parents and emotionally and physically dependent on his spouse. The jury was justified in finding that these sudden dependencies, standing in stark contrast to his previous independent life, shattered plaintiff's self-esteem.
Although the evidence suggests that, except for his less frequent headaches and lower back pains, plaintiff was approaching wellness at the time of trial, we are loathe to second-guess determinations as to the general damages to which plaintiff might be entitled. Therefore, they are affirmed. Lasha, supra; Stobart, supra.

PRE-JUDGMENT INTEREST
Brownie also complains that the jury erred in awarding legal interest from date of the accident, and they are correct as the damages were awarded under the Jones Act on the law side, i.e., tried to a jury. McFarland, supra, at 1215; Osorio v. Waterman Steamship Corp., 557 So.2d 999, 1011 (La. App. 4th Cir.), writ denied, 561 So.2d 99 (La.1990).

AMOCO'S INDEMNITY CROSS-CLAIM
After plaintiff's claims against Amoco were dismissed, Amoco reiterated the request contained in its long-filed motion for summary judgment for a ruling that the defense and indemnity provision alleged to exist between it and Brownie were enforceable. The trial judge denied Amoco's claim, finding that the service contract was not maritime in nature.
On appeal Amoco maintains that, because it was free from fault, it is entitled to reimbursement under an indemnity agreement contained in the record. Although we *381 agree with the premise of Amoco's proposition, that the Louisiana Oilfield Indemnity Act, LSA-R.S. 9:2780, does not forbid the contractual indemnification of producers found free of fault Meloy v. Conoco, Inc., 504 So.2d 833, 839 (La.1987); Cannon v. Pennzoil Co., 520 So.2d 941, 946 (La.App. 3d Cir.1987), under the particular facts of this case, we affirm.
The only items placed into evidence by Amoco on the subject are an invoice and a contract entered into in 1969 between Brownie Drilling Company and Pan American Petroleum Corporation. Nothing contained in the record connects Amoco Production Company to the agreement. Cf., Sovereign Ins. Co. v. Texas Pipeline Co., 488 So.2d 982, 984-85 (La.1986); Polozola v. Garlock, 343 So.2d 1000, 1003 (La.1977). Therefore, like the trial court, we find the purported contract unenforceable by Amoco and need not concern ourselves with whether the contract is "maritime" or "maritime but local" in nature. Compare, Rodrigue v. LeGros, 563 So.2d 248 (La.1990).
Although such agreements may be assignable, LSA-C.C. art. 1984, the party who claims contractual indemnification bears the burden of proof. Liem v. Austin Power, Inc., 569 So.2d 601 (La.App.2d Cir.1990). As there is nothing in the record to suggest that Amoco by some means became the beneficiary of the agreement between Brownie and Pan American, we affirm the conclusion reached by the trial court on this issue. See generally, McKinney v. South Cent. Bell Tel. Co., 590 So.2d 1220, 1227 (La.App. 1st Cir. 1991), writ denied, 592 So.2d 1302 (La.1992).

DECREE
For the foregoing reasons, the judgment of the trial court is amended and affirmed in part, reversed in part, and rendered. The trial judge correctly found plaintiff to be a Jones Act seaman and the jury did not err in finding Brownie Drilling Company 100% liable for plaintiff's injuries, regardless of whether they were caused by the dislocation of the metallic cap or the recoil of the elevator from the divergent speeds of it and the stand of fiberglass pipe. Moreover, the jury's awards for damages are affirmed, except to reduce its award for loss future wages to $125,000.00. Plaintiff is not entitled, however, to legal interest from date of accident, which we reduce to include interest only from date of judgment. Finally, for the foregoing reasons, we affirm the trial court's dismissal of Amoco Production Company's claim for indemnification.
Defendant, Amoco Production Company, to bear its own costs as to its indemnity claim, with defendant, Brownie Drilling Company, cast as to the remainder.
AFFIRMED IN PART AS AMENDED, REVERSED IN PART, AND RENDERED.
KNOLL, J., concurs in part and dissents in part and assigns written reasons.
KNOLL, Judge, concurring in part and dissenting in part.
I agree with the majority in all respects except for the jury award for lost future earnings. In my view, I would reverse this jury award in its entirety.
The majority correctly recognizes that there was no medical evidence by plaintiff's ten doctors who examined him to support the jury's award. The majority then mistakenly reduces the award to the highest "under the circumstances" for an additional five years. The record clearly supports, and the majority correctly recognizes, that there was no rational basis for this jury award of $500,000; therefore, the jury committed manifest error. Rather than reducing the award to the highest, this award should be reversed in full as there is no rational basis for the award. Bize v. Boyer, 408 So.2d 1309 (La.1982). The record is completely void of medical evidence as to continuing disability. Even though the doctors did not find plaintiff malingering as to his complaints of pain and headaches, they all opined that plaintiff did not require further treatment and that he was able to return to work four years prior to trial.
Further, the majority relies on Dr. Foster's opinion as to a "remote possibility" as proof enough to reduce the award to $125,000. In my view, proof of a remote possibility is not sufficient proof and certainly not *382 proof by a preponderance of the evidence, which further demonstrates error by the majority.
And finally, I point out that plaintiff was generously compensated by the jury for lost past wages in the sum of $125,000, which represented five years, although all the doctors released him from treatment and for work, four years before trial. The jury also awarded plaintiff $300,000 for his physical and mental pain and suffering, past and future. In my view, the majority's reduced award of $125,000 for future lost wages is actually a duplicitous award for pain and suffering, since all the doctors opined that his headaches and pain were not disabling, and in fact, were resolving as of the time of trial.
For these reasons, I respectfully dissent.